UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF KENTUCKY
CENTRAL DIVISION
AT LEXINGTON

| | |
|---|---|
| **CHAROLETTE DIANA WINKLER,** **Administratrix of the Estate of Brandon Clint Hacker,** | **CIVIL ACTION** **NO. 5:15-45-KKC-REW** |
| **Plaintiff,** | |
| **v.** | **MEMORANDUM OPINION AND** **ORDER** |
| **MADISON COUNTY, KENTUCKY, *et. al.*,** | |
| **Defendants.** | |

\* \* \* \* \* \* \*

On April 30, 2014, Brandon Clint Hacker was arrested and transported to the Madison County Detention Center (the "Detention Center") where he was booked and placed into the general population. He died of a perforated duodenal ulcer five days later. This case is about what unfolded in those five days while Hacker was incarcerated. The question is whether deliberate indifference, negligence, or both caused Hacker's death.

Charolette Diana Winkler, Hacker's mother and Administratrix of his Estate, seeks to hold Madison County, certain jail personnel, Advanced Correctional Healthcare, Inc. ("ACH"), and certain ACH medical providers liable for Hacker's death. Winkler filed suit under 42 U.S.C. § 1983, alleging that the defendants violated Hacker's constitutional right to adequate medical care. Winkler also alleges claims of negligence, gross negligence, outrage, wrongful death, and negligence per se. Because she cannot establish that the defendants were deliberately indifferent to a serious medical need, Winkler's constitutional claim against each defendant will be dismissed and the defendants' motions for summary (DE 154; DE 155) will be granted as to that claim. Winkler's state law claims will be

1

dismissed without prejudice so that they may be brought again and properly considered by the state court.

# I. BACKGROUND

Madison County operates the Detention Center, which is located in Richmond, Kentucky. Madison County, through Jailer Doug Thomas, contracted with ACH to provide medical care to inmates and pretrial detainees housed at the Detention Center. (DE 155-4, Agreement for Inmate Health Services). ACH contracted Dr. Nadir H. Al-Shami to be the staff physician responsible for medical care at the Detention Center. Dr. Al-Shami's duties included "on-site inmate medical care and treatment, case management and documentation, 24/7 physician call, and supervision of on-site medical staff." (DE 155-6, Work for Hire Agreement ¶ 1). Dr. Al-Shami, as "site physician," would come to the jail once a week to examine inmates, (DE 155-7, Al-Shami Depo. p. 73, ¶¶ 10–15), and otherwise be on call twenty-four hours a day. Dr. Al-Shami lived in Louisville, Kentucky and would not visit the jail every day. When Dr. Al-Shami was not present at the Detention Center, he or Layla Troutman, a nurse practitioner who lived in Los Angeles, were available by phone. (DE 155-6, Work for Hire Agreement ¶ 1).

ACH also provided on-site nursing coverage for the Detention Center through Arlene Johnson, a licensed practical nurse. Nurse Johnson worked forty hours per week, typically leaving the jail between 4:00 p.m. and 4:30 p.m. each day, and did not work on the weekends. (DE 160-5, Agreement for Inmate Health Services; DE 160-7, Johnson Depo. p. 62, ¶ ¶ 8–15). Nurse Johnson did not create orders or treatment plans for inmates, but relied upon the orders and directives initiated by the medicals providers with whom she worked. Dr. Al-Shami, Nurse Troutman, and Nurse Johnson are the only three medical professionals who provided medical services at the Detention Center relevant to this case.

Pursuant to the Detention Center's policy, inmates notified jail personnel of their medical needs by filling out sick call request forms. (DE 160-28, MCDC Policy and Procedure Manual, 800-3). The deputy jailer on duty would take the sick call forms when on rounds and leave them for Nurse Johnson. Nurse Johnson would then pick up the sick call slips and have the inmates brought to the medical office for examination. (DE 160-7, Johnson Depo. pp. 105–06). During these examinations, Nurse Johnson, "depend[ing] on the circumstances of the complaints," would gather pertinent medical information, which she would relay to a physician or another medical professional with the ability to treat the inmate. (*Id*. pp. 106–07). Because Dr. Al-Shami was not often on-site, Nurse Johnson would place a call to Dr. Al-Shami on a Detention Center telephone and take down any orders she received from him. If Dr. Al-Shami did not respond to her call, Nurse Johnson would attempt to call another medical provider, often Nurse Troutman. Nurse Johnson would then follow whatever order she received from the medical provider. Only practitioners created individual orders for inmates.

The deputy jailers at the Detention Center also had the authority to call ACH medical providers, (DE 154-4, Jones Depo. p. 40), and were duty bound to follow the medical staff's instructions regarding inmate treatment. (DE 160-28, MCDC Policy and Procedure Manual 800-4). It is undisputed that the jailers also had the authority to send an inmate to the hospital for treatment without any orders or approval from ACH physicians or staff. (DE 160-28, MCDC Policy and Procedure Manual, 800-4) ("Emergency medical services are available 24 hours a day to inmates to ensure prompt emergency medical attention. All officers are trained to respond to medical emergencies since and [sic] inmate's life may depend on appropriate first-aid.").

This was the system that was in place when Brandon Hacker arrived at the Detention Center on April 30, 2014.

## II. FACTS[1]

That day Hacker was arrested for failure to appear at a show cause hearing relating to his non-payment of child support. (DE 154-2, Order of Arrest). He was transported to the Detention Center, where upon his arrival, he was processed by Captain Tom Jones. As part of the booking process, Captain Jones conducted a medical screening, where he asked Hacker a series of health-related questions based on what was called the "Standard Medical Questions" sheet. It included the following questions: "Have you ingested dangerous levels of drugs or alcohol?" "Have you ever experienced DTS or other serious withdrawal from drugs or alcohol?" "Do you have a serious medical condition that may require attention while you are here?" To these questions, Hacker answered "No." (DE 154-5, Standard Medical Questionnaire). The only question to which Hacker answered in the affirmative was whether or not he had allergies. He answered that he was allergic to Augmentin. (*Id.*). Hacker was placed into cell number 23, a general population cell with other inmates.

For two days, Hacker made no medical complaints. That changed on Friday, May 2, when Hacker submitted his first sick call request. When prompted by the form to explain why he wished to be seen, Hacker wrote "very sick, stomach meds." (DE 160-11, Sick Call Request Form). At approximately 1:50 p.m., he was seen by Nurse Johnson. (DE 160-12, Hacker Progress Note). The medical progress note completed by Nurse Johnson shows that Hacker described his symptoms as "shaky, chills, upset stomach." (*Id.*). Nurse Johnson took

---

[1] While not raised by any party, because this action is brought on Hacker's behalf by his estate, the Court finds that statements made by Hacker to be admissible as admissions by a party opponent. Fed. R. Evid. 801(d)(2); *Estate of Shafer v. Comm'r of Internal Revenue*, 749 F.2d 1217, 1220 (6th Cir. 1984) ("Since Arthur, through his estate, is a party to this action, his statements are a classic example of an admission.") (internal citation and quotation marks omitted). Moreover, statements made by Hacker also could be considered under Fed. R. Evid. 807 and, in any event, it is possible that Hacker's statements would be admissible for a reason other than the truth of the matter asserted, such as his state of mind. The Court notes that even if the statements were stricken, their absence from the summary judgment record would not be outcome determinative.

4

Hacker's vitals and noted that Hacker displayed "active tremors, body aches, [and that he was] sweaty." (*Id*.). Nurse Johnson did not perform a physical examination on Hacker. (DE 154-8, Johnson Depo. p. 128 ¶ 12) ("I don't do physical examinations."). Nurse Johnson testified that during the examination Hacker told her he was withdrawing from heroin. (DE 160-7, Johnson Depo. p. 123 ¶ 8) ("He said he's withdrawing from heroin."). Hacker's medical history form presents the same. (DE 155-20, May 2, 2014 Medical History Form) (Under "other medical complaints," "yes" is circled next to a description "w/d from heroin."). Both facts were undisclosed until Hacker sought treatment from Nurse Johnson. Nurse Johnson, however, did not document the amount, frequency, or Hacker's last use of heroin.

Nurse Johnson then attempted to reach Dr. Al-Shami to receive the treatment plan. After twice failing to reach him, Nurse Johnson called Nurse Troutman. (DE 154-8, Johnson Depo. p. 128 ¶¶ 24–25). Nurse Johnson discussed her observations with Nurse Troutman over the phone. The medical progress note reflects that Nurse Troutman assessed the information provided and concluded that Hacker was suffering from "possible [withdrawal] from heroin." (DE 160-12, Medical Progress Note; DE 154-8, Johnson Depo. p. 128 ¶ 25). Nurse Troutman then prescribed Hacker Clonidine, Vistaril, and Bentyl. (DE 160-12, Medical Progress Note). Nurse Johnson recorded the treatment plan in the medical progress note and ordered the medications as Nurse Troutman instructed. Nurse Troutman did not order an opiate withdrawal screening, nor did Nurse Johnson generate a "Detox Flow Sheet" as required by ACH protocol. Hacker was returned to his cell in the general population and instructed to follow up as needed.

Nurse Johnson then left for the weekend. As was protocol, a deputy jailer "packed" the medications for the prisoners for the weekend. When "packing" medications for the weekend, deputy jailers referred to the "MAR" book nurses filled out to determine which medications and the amount of those medications needed to go to the inmates. On this

particular weekend, the task was left to Deputy Whitney Bratcher. (DE 160-16, Bratcher Depo. p. 35 ¶ 21). Deputy Bratcher testified that she "packed" Hacker's prescribed medications, but that the task of handing the medications to Hacker was left to a male jailer, Captain Keith Trickler. (DE 160-16, Bratcher Dep. pp. 34–36).

Hacker did not fill out any sick call requests on Saturday, May 3, nor does the record reflect that any staff members at the Detention Center generated any reports documenting that Hacker requested care that day. The record does provide some context for Hacker's condition that day, though.

A neighboring inmate, Steven Denny, testified about his observations of Hacker on Saturday, May 3. Denny, a lifelong friend of Hacker, said that he had to help Hacker up the steps to the visitation room because of Hacker "didn't feel good." (DE 160-17, Denny Depo. p. 17 ¶ 13). Denny also testified that he spoke to Hacker about "heroin and ulcers and what [Hacker was] going to do" while "guid[ing] him by his arm and help[ing] him up the steps." (DE 160-17, Denny Depo. p. 15 ¶¶ 7–24). Denny thought Hacker had ulcers because he had previously heard Hacker and his girlfriend, Tiffany Gibson, argue about it. (DE 160-17, Denny. Depo. p. 18). To Denny, Hacker "just looked sick" and Denny was worried about his friend's health. (DE 160-17, Denny Depo. p. 17 ¶ 22). There is no indication that Denny or Hacker informed ACH staff or Detention Center staff about the possibility that Hacker suffered from ulcers.

With Denny's assistance, Hacker reached the visitation room to meet with James Potter, another friend. Hacker and Potter met at the visitation room on Saturday evening. Potter testified that Hacker's face looked "greasy" and that Hacker "was just tired" (DE 160-3, Potter Depo. p. 79) and that Hacker exhibited abdominal pain. (DE 154-10, Potter Depo. p. 80). Potter also testified that when he asked Hacker how he was feeling, Hacker responded "I had to take the detox medicine." (DE 154-10, Potter Depo. p. 33).

The next day, Hacker had two interactions with Detention Center jailers concerning his need for medical attention. Around 1:00 p.m. on Sunday, Deputy Jeremy LaGrange, a floor deputy on duty that day, observed Hacker "trying to get [the staff's] attention at the door" of his cell. (DE 154-12, LaGrange Depo. p. 61 ¶¶ 14-15). Hacker told Deputy LaGrange that "he couldn't keep anything down" and "he thought he was going to be dope sick." (DE 154-12, LaGrange Depo. p. 62 ¶ 13). Deputy LaGrange took Hacker out of the cell and walked him down to booking for further evaluation.

Once at booking, Captain Jones ordered Deputy LaGrange to contact Dr. Al-Shami because, with it being the weekend, no medical provider was on-site. (DE 154-13, LaGrange Incident Report). The Incident Report filed from that day indicated that Deputy LaGrange contacted Dr. Al-Shami and that Dr. Al-Shami prescribed three medications: Vistaril, Bentyl, and Phenergan. (DE 160-20, LaGrange Incident Report). Deputy LaGrange also noted that Hacker's blood pressure was 110/70—a normal reading—so no blood pressure medication was given to Hacker at that point. (DE 160-21, LaGrange Incident Report).

A few hours later, at approximately 3:00 p.m., Hacker was seen again by Captain Jones after making a verbal complaint. (DE 160-10, Jones Depo. p. 37 ¶¶ 16–18). The Incident Report states that Hacker "thought he was bleeding internally due to the pain." (DE 160-21, Jones Incident Report). Captain Jones immediately called Dr. Al-Shami for instruction. Dr. Al-Shami instructed Captain Jones to "monitor" Hacker, but did not change his treatment plan because "internal bleeding would not cause pain." (DE 154-13, Incident Report; 160-21, Jones Incident Report). Hacker was placed back into his cell in the general population with those instructions. Dr. Al-Shami provided no other instructions to Captain Jones. Captain Corey Dunning replaced Captain Jones on the overnight shift between Sunday and Monday morning.

The record shows that Hacker filled out a second sick call request form, which was dated on Sunday, May 4. The parties do not dispute its existence, but neither the parties nor the record indicate definitively when the form was completed or to whom, if anyone, it was given. The form states that Hacker wanted to be seen because of "his blood pressure" and that he "need[ed] to [be] see[n] A.S.A.P. Having Trouble Breathing. Stomach Problems." (DE 160-18, Sick Call Request Form). Deputy LaGrange testified that he was unaware of a sick call report on file at the time he interacted with Hacker. (DE 154-12, LaGrange Depo. p. 62 ¶¶ 18–19) ("Not to me. Whether he did [fill out a form] or not, I don't know."). Rather, Deputy LaGrange responded to Hacker solely because Hacker called for his attention while he was on duty. Consistent with Deputy LaGrange's telling, Dr. Al-Shami testified that Deputy LaGrange did not mention Hacker's complaint of breathing trouble when the two spoke on the phone. Hacker's treatment plan, he testified, was based only on what Deputy LaGrange told him. (DE 155-7, Al-Shami Depo. p. 132).

Hacker made several phone calls that Sunday, all to his grandmother, Helen Hacker. Though the record includes no time log of the calls, Ms. Hacker testified that Hacker called her in the afternoon and in the evening. (DE 160-2, Hacker Depo. p. 15). She stated that, in all of the calls, he complained of stomach pain and told her that he wanted to go to the hospital. (DE 160-2, Hacker Depo. p. 16). Ms. Hacker called the detention center herself to let the staff know of her concerns. According to Ms. Hacker, someone at the jail listened to her concerns and assured her Hacker was being monitored. (DE 160-2, Hacker Depo. p. 20 ¶ 24). Ms. Hacker was unsure of who answered the phone.

Around 3:00 a.m. on Monday, May 5, 2014, Captain Keith Trickler saw Hacker while passing out the inmates' medication. At the time he first saw Hacker, Captain Trickler did not know why Hacker had to take the medication. (DE 160-23, Trickler Depo. p. 41). It was only after Captain Trickler gave Hacker his medication (*Id*. at 42) that Hacker "[s]aid his

stomach was upset, said that he had been doing drugs for quite a while, and he just said that he was really, really dope sick." (*Id*. at pp. 61 ¶ 24 – 62 ¶ 1). Captain Trickler's investigation report, written later that day, also described the interaction:

> On the date of May 5, 2014 on or about the time of 03:00 to 03:20, I Captain Keith Trickler was passing out lower level meds when I Captain Trickler got to Cell 023. I Captain Trickler noticed inmate Brandon Hacker sitting at the table. I asked inmate Hacker what was wrong, inmate Hacker stated to me that he was really going through it. Inmate Hacker stated that he was dope sick. I Captain Trickler gave inmate Hacker his meds and went to the next cell for meds.

(DE 155-23, Trickler Incident Report). Captain Trickler then continued on his rounds through the detention center without notifying medical personnel of Hacker's complaints. Captain Trickler testified that he did not call a healthcare provider after he interacted with Hacker because "everybody in the cell [told him] that [Hacker] was going to the doctor that morning. . . ." (DE 154-14, Trickler Depo. p. 58 ¶¶ 17–20); (DE 160-23, Trickler Depo. p. 37 ¶¶ 19–21) ("He'd – inmates inside the cell had told me that he had told them that he [] already had plans to see the doctor later on that day."). Captain Trickler further explained that he did not inform any medical personnel of Hacker's complaints "[b]ecause [Hacker] didn't tell [him] that he wanted to go to the – to the doctor." (DE 160-23, Trickler Depo. p. 42 ¶¶ 22–23). As Captain Trickler saw it, though no policy directed this behavior, he only called medical personnel for immediate evaluation when the inmate told him to call medical because "nine times out of ten if an inmate really wants to go to a doctor, they will be the one to – to tell you." (*Id*. at p. 43 ¶¶ 2–5).

Deputy Whitney Bratcher had contact with Hacker a few hours later at approximately 5:30 a.m. while serving breakfast to the inmates in Cell 23. Before Deputy Bratcher served breakfast, she spoke with Captain Trickler. Deputy Bratcher testified that Captain Trickler told her that he had administered Hacker's medications and informed her of the conversation he had with Hacker earlier that morning. (DE 154-16, Bratcher Depo. p. 37). Deputy Bratcher

stated that she believed Captain Trickler gave Hacker another sick call request form to fill out. (*Id.*).

When it came Hacker's turn to be served, Deputy Bratcher testified that Hacker did not get up from the floor to receive his food. (*Id.* at p. 53). Hacker did not speak to Deputy Bratcher at all. (*Id.* at p. 32). Deputy Bratcher did not think much of Hacker's action because it was "not unusual" for inmates not to get up for breakfast. (*Id.* at p. 53 ¶ 9). Deputy Bratcher left Cell 23 without a filled-out sick call request form. She did not report to anyone in the jail that Hacker failed to get up for breakfast. (*Id.* at p. 40). An hour later, Deputy Bratcher came back around Cell 23 to pick up trash, but did not see or interact with Hacker. (*Id.*).

Captain Jones reported for his shift around 7:00 a.m. that morning. At around 8:00 a.m., when Nurse Johnson arrived, Captain Jones "immediately went" to Nurse Johnson's office. (DE 154-4, Jones Depo. pp. 70–71). He handed her Deputy LaGrange's incident report and asked if the nurse "could see [Hacker] expediently." (*Id.* at p. 71). Before Captain Jones met with Nurse Johnson, he had been informed by another deputy on duty that morning, Deputy Matt Dees, that Hacker had made another medical complaint. (*Id.*). According to Deputy Dees' incident report, the following took place that Monday morning:

> Sir, walked by inmate pecked on glass I entered cell and inmate Hacker was sitting in chair. Inmate Hager [Hacker] stated that he was having withdrawals from heroin and felt very sick. Left cell and Captain Tom Jones told me to take him to medical. I helped inmate Hacker put on a t-shirt and walked him to medical.

(DE 155-24, Dees Incident Report).

At the same time, Nurse Johnson reviewed the information given to her by Captain Jones, including the incident report completed by Deputy LaGrange and the sick call request form where Hacker complained of "his blood pressure" and that he "need[ed] to [be] see[n] A.S.A.P. Having Trouble Breathing. Stomach Problems." (DE 160-18, Sick Call Request

Form; DE 160-7, Johnson Depo. pp. 172–73).[2] Deputy Dees then brought Hacker to see Nurse Johnson where:

> [Hacker] sat down in a chair and Nurse was interviewing him and asking him what drugs he was withdrawing from. Nurse asked me to get him some Gatorade. Went to kitchen and got 2 cups of Gatorade, returned to medical. Inmate started drinking Gatorade and I left right after this occurred and went to tower.

(DE 155-24, Dees Incident Report).

Nurse Johnson met with Hacker for a health appraisal. She observed that he was "sweaty" and that "he hadn't had a bowl movement in a while." (DE 155-25, Medical Progress Note). Nurse Johnson next asked Hacker several questions. She reported that Hacker told her that "he was trying to get through withdrawals on his own." (*Id*.). When asked what type of drugs he was withdrawing from, Nurse Johnson noted that Hacker responded "heroin." (*Id*.). Nurse Johnson also observed "track marks [] [on his] arms." (*Id*.). Nurse Johnson then called Dr. Al-Shami for instruction, and Dr. Al-Shami ordered Vistaril and Bentyl, along with increased fluids and rest. (*Id*.). He told Nurse Johnson to follow up as needed.

Moments after Nurse Johnson administered the medication, Hacker "laid back on [the] bed [and his] eyes rolled to [the] back of [his] head." (*Id*.). After Hacker did not respond to her verbal stimuli and her attempts to use an ammonia inhalant failed, Nurse Johnson used an ambu-bag to assist Hacker's slow breathing while Captain Jones called the EMS for an ambulance. (DE 155-25, Medical Progress Note; DE 154-8, Johnson Depo. p. 141). EMS arrived at 9:46 a.m., intubated Hacker, and transported him to the emergency room at Baptist Health- Richmond. As Hacker left, Nurse Johnson called Dr. Al-Shami to notify him of Hacker's "change of condition." (DE 155-25, Medical Progress Note).

---

[2] As noted above, there is debate as to the date and time this second sick call request form was completed. The parties do not dispute, however, that it was the sick call request form that Nurse Johnson examined when she returned to Madison County Detention Center on Monday, May 5, 2014. She testified that it is her signature on the form. (DE 155-13, Johnson Dep. at 152).

Once at the hospital, emergency department staff continued CPR and ran a "code blue" in an attempt to revive Hacker. Those efforts failed. Hacker was pronounced dead at 10:47 a.m. An autopsy later determined that Hacker's cause of death was acute peritonitis as a result of peptic ulcer diseases with perforation of duodenal ulcers. (DE 154-18, Death Certificate).

Winkler sued under 42 U.S.C. § 1983 alleging that the defendants violated Hacker's Fourteenth Amendment right to protection against cruel and unusual punishment. Plaintiff also alleges claims of negligence, gross negligence, outrage, wrongful death, and negligence per se under Kentucky law. All defendants now move for summary judgment on all counts.

### III. SUMMARY JUDGMENT STANDARD

As the moving parties, the defendants must demonstrate that there is no genuine issue of material fact and that Winkler's claims must fail as a matter of law. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986) (requiring the moving party to set forth "the basis for its motion, and identify[ ] those portions of 'the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any,' which it believes demonstrate an absence of a genuine issue of material fact"); Fed. R. Civ. P. 56(a). Viewing the evidence in the light most favorable to the non-moving party, the Court must determine "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 251–52 (1986); *Ahlers v. Schebil*, 188 F.3d 365, 369 (6th Cir. 1999).

# IV. ANALYSIS

A. <u>Winkler's § 1983 Claim for Violation of Hacker's Constitutional Right to be from Cruel and Unusual Punishment Against Individual Defendants</u>

The "Constitution . . . erects a series of hurdles that allegations of prisoner mistreatment must clear before they proceed to a jury." *Clark-Murphy v. Foreback*, 439 F.3d 280, 286 (6th Cir. 2006).

The first is the legal standard applicable in this case. The Fourteenth Amendment forbids prison officials from unnecessarily and wantonly inflicting pain on a pretrial detainee by acting with deliberate indifference to his serious medical needs. *See Jones v. Muskegon Cty.*, 625 F.3d 935, 941 (6th Cir. 2010); *see also Estelle v. Gamble*, 429 U.S. 97, 104 (1976). A § 1983 claim asserting "a constitutional violation for denial of medical care has objective and subjective components." *Jones*, 625 F.3d at 941. The objective component requires the existence of a "sufficiently serious" medical need. *Farmer v. Brennan*, 511 U.S. 825, 834 (1994) (citation omitted). Such a medical need has been defined as one "that has been diagnosed by a physician as mandating treatment or one that is so obvious that even a lay person would easily recognize the necessity for a doctor's attention." *Harrison v. Ash*, 539 F.3d 510, 518 (6th Cir. 2008) (citations omitted). A claimant may satisfy the subjective prong of this inquiry by establishing that "the official knows of and disregards an excessive risk to inmate health or safety," which is to say "the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference." *Farmer*, 511 U.S. at 837.

The second hurdle is one of defense. In § 1983 constitutional tort claims, qualified immunity prevents government officials from being held liable if (1) the officers did not violate any constitutional guarantees or (2) the guarantee, even if violated, was not "clearly

established" at the time of the alleged misconduct. *See Pearson v. Callahan*, 555 U.S. 223, 232 (2009).

The parties do not dispute that Winkler has established the objective component of her Fourteenth Amendment claim, nor does either side dispute that the right at issue is not clearly established. *See Rouster v. Cty. of Saginaw*, 749 F.3d 437, 446 (6th 2014) (considering a "perforated duodenum, which leaked toxic materials into [the] abdominal cavity and caused internal bleeding" to be an objectively serious medical need); *see generally Nallani v. Wayne Cty.*, 665 F. App'x 498, 511, 2016 WL 7241400, at *10 (6th Cir. Dec. 15, 2016) (citing *Estelle*, 429 U.S. at 104–05) ("[A]t least since the 1976 Supreme Court's decision in *Estelle v. Gamble*, the principle of law has been clearly established 'that deliberate indifference to serious medical needs of prisoners constitutes' a violation of the Eighth Amendment, regardless of whether that indifference is manifested by prison doctors or prison guards."); *Arrington- Bey v. City of Bedford Heights*, 858 F.3d 988, 993 (6th Cir. 2017) (quoting *White v. Pauly*, ⸺ U.S. ⸺, 137 S. Ct. 548, 552 (2017) ("The Supreme Court recently reminded us that a plaintiff must identify a case with a similar fact pattern that would have given 'fair and clear warning to officers' about what the law requires.").

Thus the question of immunity and liability become the same: whether the subjective component of a deliberate indifference claim necessary for Winkler to hold them constitutionally responsible has been met. Having assessed each defendant's potential liability, *Binay v. Bettendorf*, 601 F.3d 640, 650 (6th Cir. 2010), the Court concludes that Winkler's constitutional claims do not clear the necessary hurdles to place this case in front of a trier of fact. Accordingly, the Court will grant defendants' motions for summary judgment as to Winkler's constitutional claim.

1. <u>Claims Against Advance Correctional Health's Individual Medical Providers</u>

Section 1983 requires a plaintiff to establish the following two elements: (1) the defendant acted under the color of state law; and (2) the defendant's conduct deprived the plaintiff of a federally guaranteed right. *Handy–Clay v. City of Memphis*, 695 F.3d 531, 539 (6th Cir. 2012). Medical professionals who render services to inmates at a county prison qualify as state actors for the purposes of § 1983. *See Harrison v. Ash*, 539 F.3d 510, 521 (6th Cir. 2008) (citing *West v. Atkins*, 487 U.S. 42, 56 (1988)). Whether Dr. Al-Shami, Nurse Troutman, and Nurse Johnson each were deliberately indifferent to a serious medical need is a matter of application of law to the facts.

**a. Nurse Layla Troutman is Entitled to Summary Judgment**

Nurse Troutman had one interaction concerning Hacker on Friday May 2. After Nurse Johnson was unable to contact Dr. Al-Shami, she called Nurse Troutman, who was not physically present at the Detention Center. Nurse Johnson testified that she notified Nurse Troutman "of the facts" she observed (DE 160-7, Johnson Depo. p. 128 ¶¶ 22–23) when evaluating Hacker, who had filled out a sick call request. Nurse Troutman, after listening to the symptoms as they were reported to her, ordered Nurse Johnson to start a plan of medication consisting of Clonidine, Vistaril, and Bentyl to treat what she interpreted as withdrawal symptoms. Winkler does not specifically argue how Nurse Troutman showed deliberate indifference. Instead, Winkler states that the nurse made "the wrong diagnosis" and that "she failed to order the proper monitoring for an inmate experiencing withdrawal." (DE 162, at 32).

None of those assertions or the facts in the record creates a material issue as to Nurse Troutman's knowledge about Hacker's serious medical condition or as to whether she recklessly disregarded any knowledge that she may have inferred. First, "deliberate indifference cannot be based solely on a violation of company policy . . . ." *Rice v. Montgomery*

*Cty.*, No. 5:14-CV-181-KKC, 2016 WL 2596035, at *12 (E.D. Ky. May 5, 2016). Instead, the Court must look to what Nurse Troutman actually knew at the time she treated Hacker and what she did with any knowledge she had.

Nurse Troutman treated Hacker for the condition that she thought he had—withdrawal. (DE 160-12, Medical Progress Note). She was wrong. But there is no evidence in the record to suggest that Nurse Troutman was aware of what was actually ailing Hacker when she treated him. Even if she would have ordered Nurse Johnson to initiate the withdrawal protocol (or to otherwise order "appropriate and timely monitoring" as Winkler says), nothing in that monitoring could have played into what she knew at the time she gave the orders. Any knowledge gained in the future cannot be imputed to Nurse Troutman retrospectively. Hacker did not disclose his complete medical history, and it was only during Nurse Johnson's treatment that she learned Hacker did have a past history of drug withdrawal. Moreover, Nurse Troutman did provide treatment to Hacker and did instruct Nurse Johnson to have Hacker follow up. It is true that opiate withdrawal protocol was not initiated, but based on the facts Nurse Troutman received,  her decision to treat Hacker for withdrawal in the manner she did was not "so cursory as to amount to a conscious disregard of his needs." *Rouster*, 749 F.3d at 448.

### b. Nurse Arlene Johnson is Entitled to Summary Judgment

Winkler argues that Nurse Johnson displayed deliberate indifference to Hacker when she saw him on his first sick call at 1:50 p.m. on May 2. Like her claim against Nurse Troutman, Winkler faults and seeks to hold Nurse Johnson constitutionally liable for failing to follow specific withdrawal protocols. From those failures, Winkler argues, Nurse Troutman did not receive enough information to make a sufficient medical judgment, which ended in Hacker losing his life. (DE 162, at 31). Winkler may be correct. But that does not necessarily mean that Nurse Johnson was deliberately indifferent. *See Harris v. City of Circleville*, 583

F.3d 356, 369 (6th Cir. 2009) (considering a failure to follow policy as evidence that the subjective component of a deliberate indifference claim has been met).

What matters here is that Nurse Johnson was not aware of facts from which it could be inferred that a substantial risk existed, and it is nevertheless clear from the evidence that Nurse Johnson did not draw an inference. Nurse Johnson did not know about Hacker's medical past initially, but learned of his past history of heroin withdrawal. She observed Hacker, took down his vitals, reported what she observed and what Hacker told her—which the medical records indicate were complaints of withdrawal (DE 155-20)—and followed Nurse Troutman's orders. While she could have done more, the facts do not show that Nurse Johnson either perceived that Hacker had a medical condition more serious than drug withdrawal, and they certainly do not show that Nurse Johnson consciously disregarded any risk to a serious medical need—including any symptoms exhibited by Hacker at the time he was seen. At bottom, Nurse Johnson saw and evaluated Hacker, relayed what she saw to Nurse Troutman, and then followed Nurse Troutman's orders. Her actions may have not been perfect, but they were not indifferent so as to rise to the level of a constitutional violation.

### c. Doctor Nadir Al-Shami is Entitled to Summary Judgment

Dr. Al-Shami had two interactions with Hacker on Sunday, May 4, each occurring within a matter of hours. First, Deputy LaGrange called him after Hacker complained of being "dope sick." Dr. Al-Shami prescribed three medications: Vistaril, Bentyl, and Phenergan, for Hacker's withdrawal symptoms and for his inability to "keep anything down." (DE 160-20; DE 160-27, Al-Shami Depo. p. 109 ¶¶ 20–21; 113–114). No blood pressure medication was given to Hacker at that point because Hacker's blood pressure was 110/70—a normal reading. (DE 160-21, Incident Report). About an hour later, Captain Jones called Dr. Al-Shami after Hacker complained of stomach pain and of fear that he had internal bleeding. (DE 160-21, Al-Shami Depo. p. 115 ¶¶ 24–25). Dr. Al-Shami told Captain Jones to

have Hacker monitored, but he did not change Hacker's treatment. Dr. Al-Shami assessed that Hacker was not likely bleeding because "internal bleeding doesn't cause pain, and people when they bleed, they don't know." (DE 160-21, Al-Shami Depo. p.122 ¶¶ 12–21). Instead, Dr. Al-Shami explained in his testimony, signs of internal bleeding are normally shown when people "vomit blood or they have dark stool . . . tarred looking or blood or coffee ground blood." (DE 160-21, Al-Shami Depo. p. 116 ¶¶ 20–21).

As a starting point, "courts are generally reluctant to second guess the medical judgment of prison medical officials." *Jones*, 625 F.3d at 944. "[C]ourts find deliberate indifference where there is evidence tending to establish that the physician is present while the inmate is in distress, that distress is communicated to the physician, and the physician purposefully ignores the distress knowing that an adverse outcome is likely to occur." *Id*. at 945 (citing *Gibson v. Moskowitz*, 523 F.3d 657 (6th Cir. 2008)) (emphasis omitted). This does not mean that prison officials are absolved of liability by merely treating an inmate, as "[a] government doctor has a duty to do more than simply provide some treatment to a prisoner who has serious medical needs; instead, the doctor must provide medical treatment to the patient without consciously exposing the patient to an excessive risk of serious harm." *Sours v. Big Sandy Regional Jail Authority*, 593 F. App'x 478, 486 (6th Cir. 2014).

The Court cannot conclude based on his interactions with Hacker that Dr. Al-Shami was deliberately indifferent to a serious medical need. Dr. Al-Shami was not subjectively aware that Hacker was experiencing anything other than drug withdrawal. Like in *Rouster*, Winkler has not shown that Dr. Al-Shami "was in fact aware that [Hacker] had a serious medical need." *Rouster*, at 449. Dr. Al-Shami "did not have one very critical piece of information" which could allow for an inference to be drawn: that ulcers were the cause of the symptoms. *Id* at 448. There is nothing in the record to suggest that Dr. Al-Shami knew

about this possibility when he treated Hacker. And while it is true that perhaps Dr. Al-Shami could have gotten to the bottom of it all with more questions, his failure "to follow best medical practices is not necessarily evidence of deliberate indifference if [he] did not *know* that [Hacker's complaints of] [internal bleeding] was caused by a serious ailment." *Id*. at 449. As the doctor testified, Hacker's complaints of pain were not necessarily indicative of internal bleeding, as other objective indicators would prove more definitive. And, furthermore, no matter what Dr. Al-Shami should have known, the evidence is clear as to what Dr. Al-Shami did infer from Hacker's complaints; he perceived Hacker's ailment as nothing other than drug withdrawal.

Additionally, Dr. Al-Shami did not consciously disregard Hacker's complaints and needs, nor did he fail to treat what he thought were symptoms of withdrawal. In the first instance, he changed Hacker's medications based on the symptoms Hacker exhibited (including taking him off of the blood pressure medication previously prescribed by Nurse Troutman). In the second, Dr. Al-Shami considered Hacker's complaints and made a medical judgment to stay with the course of treatment. Much like her charges against Nurse Troutman and Nurse Johnson, Winkler argues that Dr. Al-Shami was deliberately indifferent in the way he treated Hacker based on what he did not do and what he could have done to provide better treatment. But his provision of treatment was not unreasonable in response to the symptoms Hacker exhibited, *Farmer*, 511 U.S. at 844–45, because, as stated above, there is no indication that Dr. Al-Shami perceived Hacker's ailment as anything other than drug withdrawal.

Dr. Al-Shami's may seem inappropriate in hindsight, based on his knowledge and the inferences he drew from the facts of which he was aware, it was not unreasonable to continue to treat Hacker for withdrawal symptoms. Even though Dr. Al-Shami's diagnosis was incorrect and Hacker fell victim to Dr. Al-Shami's and others' misjudgment, any "[n]egligence

in diagnosing a medical condition does not constitute unconstitutional deliberate indifference." *Jones*, 625 F.3d at 945. As the Sixth Circuit has stated, "a plaintiff alleging deliberate indifference must show more than negligence or the misdiagnosis of an ailment. When a prison doctor provides treatment, albeit carelessly or inefficaciously, to a prisoner, he has not displayed a deliberate indifference to the prisoner's needs, but merely a degree of incompetence which does not rise to the level of a constitutional violation." *Comstock v. McCrary*, 273 F.3d 693, 703 (6th Cir. 2001) (internal citations omitted).

2. Claims Against the Madison County Defendants in their Individual Capacities

In addition to the ACH defendants, Winkler claims that several jailers at the Detention Center were deliberately indifferent to Hacker. Each of these defendants will be discussed separately.

**a. Deputy J.J. LaGrange is Entitled to Summary Judgment**

Deputy LaGrange worked as the floor deputy on Sunday, May 4. Deputy LaGrange's only documented interaction with Hacker occurred around 1:00 p.m. when Hacker caught LaGrange's attention at the cell door. Deputy LaGrange testified that Hacker said "he couldn't keep anything down" and "he thought he was going to be dope sick." (DE 154-12, LaGrange Depo. p. 62). Deputy LaGrange did not ignore Hacker's call for attention. Instead, after he listened to Hacker, Deputy LaGrange took Hacker out of his cell and walked him down to booking for further evaluation. At booking, Deputy LaGrange followed Captain Jones' order to contact the medical professional and called Dr. Al-Shami. Deputy LaGrange informed Dr. Al-Shami of Hacker's complaints and administered the medications that Dr. Al-Shami prescribed. (DE 154-13, Incident Report).

Winkler does not dispute that Deputy LaGrange took Hacker to booking, called a medical professional, and administered medication. Winkler instead argues that Deputy LaGrange was deliberately indifferent because he "contacted Dr. Al-Shami with very limited

information about [Hacker]." (DE 160, at 28). If Deputy LaGrange "had collected more information about [Hacker]," Winkler states, "Dr. Al-Shami would have been better equipped to assess his patient." (*Id*.).

Again, all of this may be true. But this argument does not create a material issue of fact as it relates to Deputy LaGrange's knowledge about Hacker's serious medical need, nor does it do anything to indicate that Deputy LaGrange recklessly disregarded his knowledge about Hacker's medical need. While it is not clear from the record whether Deputy LaGrange thought Hacker had a serious medical condition, the Court can assume that he did because Deputy LaGrange thought enough of Hacker's cell-door protestations to go over to the cell to investigate. But even so, there is no evidence that Deputy LaGrange acted with deliberate indifference toward what he appreciated about Hacker's condition. Deputy LaGrange took Hacker to booking, told his supervisor what was going on, and relayed what he knew of Hacker's condition to Dr. Al-Shami as he was told to do. After receiving instruction from the physician, Deputy LaGrange administered the medicine Dr. Al-Shami prescribed.

Although Winkler may object to the thoroughness by which Deputy LaGrange did his job, this objection does not suffice to create a triable issue as to whether Deputy LaGrange was deliberately indifferent by consciously disregarding a risk to Hacker's medical needs. He was not and is therefore entitled to summary judgment. *See Ruiz-Bueno v. Scott*, 639 F. App'x 354, 360 (6th Cir. 2016) ("Although Hahn did not follow up to determine whether anything was done in response to his request, the fact that Hahn requested medical attention for Peterson is sufficient to demonstrate that he was not deliberately indifferent.").

**b. Captain Corey Dunning is Entitled to Summary Judgment**

Captain Dunning worked the overnight shift from 11:00 p.m. Sunday, May 4, until the morning of Monday, May 5, when Captain Jones returned to duty. The evidence related to Captain Dunning's involvement in this case is sparse. The evidence that does exist does

not present evidence that Captain Dunning was actually aware that Hacker had a serious medical need or that Captain Dunning consciously disregarded any risk of which he was aware. There is no evidence that Captain Dunning interacted with Hacker at any point during the time he was on shift. (DE 160-29, Dunning Depo. pp. 22–23). In fact, when asked during his deposition if he had any information on Hacker, Captain Dunning simply replied "No." (DE 160-29, Dunning Depo. p. 17 ¶ 5).

Winkler points to Captain Dunning's deposition testimony where he stated that "he could" have been told about Hacker's medical complaints (DE 160-29, Dunning Dep. p. 22, ¶ ¶ 1-18, p. 23 ¶ 1-7) and argues that one could reasonably infer that he was told. (DE 160, at 29). But this is insufficient. At best, and not without further speculation, this testimony shows that Captain Dunning may have been told that Hacker was ill and/or receiving medical treatment for withdrawal, but it does not prove that he was aware of any facts that a substantial risk of serious harm existed or that he actually drew such an inference. Winkler show allege more to allow the Court to impute sufficient knowledge to Captain Dunning. Conscious disregard requires a level of culpability higher than negligence and is one concerned with what a defendant *actually* knows. *Farmer*, 511 U.S. at 836. The evidence as it relates to Captain Dunning does not establish that he consciously disregarded any risk to Hacker's serious medical need and therefore Captain Dunning is entitled to summary judgment on this claim.

### c. Captain Tom Jones is Entitled to Summary Judgment

Captain Jones interacted with Hacker on several occasions in the five days that Hacker was incarcerated at Detention Center. Captain Jones performed Hacker's medical intake when Hacker arrived at Detention Center on Wednesday, April 30, and placed Hacker into the general population. Captain Jones also saw Hacker twice on Sunday, May 4. He ordered Deputy LaGrange to contact Dr. Al-Shami after Deputy LaGrange brought Hacker

to booking around 1:00 p.m. Two hours later, Hacker returned to booking complaining of stomach pain and what Hacker thought was internal bleeding. Captain Jones immediately called Dr. Al-Shami, who told Captain Jones that Hacker's latest complaints did not warrant a change in treatment and to monitor the inmate. Captain Jones then placed Hacker back into general population. Lastly, Captain Jones, upon returning to work on Monday after taking the night off, "immediately" advised Nurse Troutman of Hacker's medical complaints. (DE 160-10, Jones Depo. p. 71 ¶ 12).

Winkler's complaints against Captain Jones' conduct are similar to hers against Deputy LaGrange. Winkler charges Captain Jones with "fail[ing] to obtain an adequate intake medical history" when Hacker was booked, "fail[ing] to obtain any history related to Clint's complaints," "contact[ing] Dr. Al-Shami with very limited information," and failing to provide Dr. Al-Shami with the necessary information to make better medical decisions. (DE 160, at 28).

First, although it may have been obvious that Hacker suffered from some kind of serious medical illness, the record does not confirm that Captain Jones was subjectively aware that Hacker was suffering from anything other than withdrawal. Hacker's medical intake form reflected nothing of significance and there is nothing in the record to indicate that Hacker ever told anyone on staff, let alone Captain Jones, that he had previous issues with ulcers. Moreover, given that Hacker's treatment was entirely consistent with withdrawals, it is not entirely clear that Captain Jones ever thought something more sinister was afoot.

Moreover, even if the evidence taken in the light most favorable to Winkler establishes that Captain Jones was likely subjectively aware of a substantial risk of harm to Hacker, there is no proof that Captain Jones acted with deliberate indifference to that risk. When Deputy LaGrange took Hacker to booking, Captain Jones assessed the situation and ordered

Deputy LaGrange to contact Dr. Al-Shami. When Hacker returned to booking, Captain Jones called Dr. Al-Shami himself and treated Hacker in a manner consistent with Dr. Al-Shami's instructions.

In both instances, Captain Jones did not display deliberate indifference when he encountered Hacker. He did not shake off Hacker's first or second complaint or ignore Hacker. He called a medical professional for help. Moreover, Captain Jones was fully entitled to rely on the medical judgments made by Dr. Al-Shami. *See Harrison v. Ash*, 539 F.3d 510, 519 (6th Cir. 2008) (concluding a correctional officer was not deliberately indifferent when, upon the inmate's complaint, he requested the nurse to "check on" the inmate); *see also Smith v. Cty. of Lenawee*, 505 F. App'x 526, 532 (6th Cir. 2012) (holding a correctional officer was not deliberately indifferent when he contacted a doctor regarding an inmate's medical condition and received assurances regarding the inmate's medical status); *Ronayne v. Ficano*, 173 F.3d 856, 1999 WL 183479, at *3 (6th Cir. 1999) (unpublished table decision); *Hamilton v. Pike Cty.*, No. 11-CV-99-ART, 2013 WL 529936, at *7 (E.D. Ky. Feb. 11, 2013).

Though Captain Jones observed Hacker's condition and recognized that he needed to called Dr. Al-Shami (or to instruct another deputy to do the same), the record is insufficient to prove that Captain Jones acted with deliberate indifference. *See Scott*, 639 F. App'x at 360; *see also Farmer*, 511 U.S. at 844 ("[P]rison officials who actually knew of a substantial risk to inmate health or safety may be found free from liability if they responded reasonably to the risk, even if the harm ultimately was not averted."). Captain Jones is therefore entitled to summary judgment.

### d. Captain Keith Trickler is Entitled to Summary Judgment

Captain Trickler made his first and only contact with Hacker early Monday morning on May 5 when he passed out medications to the inmates. Hacker was sitting on a table in his cell (DE 154-14, Trickler Depo. p. 14 ¶ 3) and, after Captain Trickler gave Hacker his

medication, Hacker told Captain Trickler that his stomach was upset, "said that he had been doing drugs for quite a while, and he just said that he was really, really dope sick." (DE 160-23, Trickler Depo. pp. 61–62). Captain Trickler was informed by other inmates that Hacker was expected to visit the nurse later in the morning and then Captain Trickler continued on to other cells.

Winkler argues that, although Hacker informed Captain Trickler that he "dope sick," Trickler was deliberately indifferent because he failed to conduct any further investigation or examination and made no attempt to seek guidance from any medical authority. (DE 160, at 29). Captain Trickler's actions that morning, while undoubtedly questionable, were not constitutionally inadequate.

Hacker told Captain Trickler that he was "dope sick," and Hacker's own assessment coincided with Captain Trickler's observations. (DE 160-23, Trickler Depo. p. 62 ¶¶ 2–3) (in response to the question "how did Hacker look," Captain Trickler stated: "Like a person that was withdrawing."). Everything Captain Trickler perceived Hacker to be experiencing was consistent with withdrawals. Winkler presents no facts to suggest that Captain Trickler knew of the seriousness of Hacker's condition before the Monday morning interaction, and none of the facts indicate that Captain Trickler consciously disregarded Hacker's condition after the two spoke briefly across the cell door.

Comparison is useful on this point. Although it is not entirely clear to whom Winkler refers, she cites to *Finn v. Warren Cty., et al.*, No. 1:10-CV-16-JHM, 2012 WL 3066586 (W.D. Ky. July 27, 2016), for the proposition that "deputy jailers who are aware of an inmate's serious medical condition and do nothing" are deliberately indifferent. (DE 160, at 29). In *Finn*, the court held two deputy jailers constitutionally liable in a scenario similar to the present case. One jailer, Captain Martin, was found deliberately indifferent when he "did not report his observation [of the deceased experiencing symptoms of withdrawal], did not enter

25

[his] cell, and did not even attempt to engage [him] in conversation." 2012 WL 3066586, at *10. The other jailer, Deputy Maxwell, also "simply listed" the deceased as "appears to be ok," even though the deputy knew of the deceased's condition. 2012 WL 3066586, at *11. In contrast, the facts of this case make clear that Captain Trickler did not simply ignore Hacker. Unlike Captain Martin and Deputy Maxwell in *Finn*, Captain Trickler engaged Hacker, gave him his medication, and determined that a nurse would examine him later in the morning. Thus, even to the extent he did perceive a risk, Captain Trickler did not consciously disregard it because he performed his duties. Captain Trickler's decision not to take further action is concerning. However, "[t]hat he did not take the extra step of bringing the need for more aggressive intervention to his superiors, that failure at most . . . amounts only to negligence." *Smith*, 505 F. App'x at 536.

### e. Deputy Jailer Whitney Bratcher is Entitled to Summary Judgment

Deputy Bratcher served breakfast to Cell 23 at approximately 5:30 a.m. and came back around to the cell an hour later to pick up trash. Deputy Bratcher testified that she knew Hacker received medication because she spoke with Captain Trickler about Hacker and because she was the one who most likely "packed" the medicine for the weekend. Deputy Bratcher did not engage with Hacker in either her first or second trip by Cell 23.

Deputy Bratcher's is a close case. Winkler does little to address Deputy Bratcher's actions except to state that she "did not do any further investigation or examination and did not seek the guidance of any medical authority." (DE 160, at 29). Winkler is correct, to an extent. The record makes clear that Deputy Bratcher did not do much of anything with respect to Hacker. Unlike Captain Trickler, she did not engage with Hacker. However, deliberate indifference also requires that Deputy Bratcher have a sufficiently culpable mental state. That is, Deputy Bratcher must have actually inferred that a substantial risk of serious harm existed. The Court declines to make such a finding.

Deputy Bratcher's only information about Hacker came from Captain Trickler. She was informed that Hacker was "really going through it" and that Hacker was being treated for those symptoms. Thus, she had reason to assume that Hacker's condition was being treated. It does not appear from the facts that Deputy Bratcher ever drew the inference that a substantial risk of serious harm to Hacker existed. The only evidence suggesting that Hacker was seriously ill of which Deputy Bratcher was aware was what Captain Trickler told her that Hacker did not get up to receive his breakfast. To the latter fact, importantly, the evidence shows that Deputy Bratcher testified that she did not think much of Hacker's failure to respond to the breakfast call because it was not "unusual" for inmates to not get up at the early hour. (DE 154-16, Bratcher Depo. p. 53). This evidence shows that Deputy Bratcher never drew the connection between Hacker's failure to get up and Hacker's serious medical need. Without more, the facts are insufficient for Winkler to show a question of fact as to whether Deputy Bratcher should have known of the risk. *Garretson v. City of Madison Heights*, 407 F.3d 789, 797 (6th Cir. 2005).

Perhaps Deputy Bratcher should have done more. The facts assuredly show that she made an incorrect assumption. But "[i]f an officer fails to act in the face of an obvious risk of which he should have known but did not, the officer has not violated the Eighth or Fourteenth Amendment." *Watkins v. City of Battle Creek*, 273 F.3d 682, 686 (6th Cir. 2003). Here, Deputy Bratcher did not infer that a substantial risk of serious harm existed because the facts do not prove her to have believed that Hacker was experiencing a medical emergency. *See, e.g.*, *Speers v. Cty. of Berrien*, 196 F. App'x 390, 396–97 (6th Cir. 2006) ("By itself, the fact that Hyun knew that Speers was going through alcohol withdrawal, an occasional reality of life in a prison setting, does not establish a triable issue of fact over deliberate indifference."). Deliberate indifference requires actual knowledge of such a risk. Without the necessary inference, Deputy Bratcher is entitled to summary judgment on this claim.

**f. Jailer Doug Thomas is Entitled to Summary Judgment**

Jailer Thomas was the Madison County Jailer at the time of Hacker's death. Winkler seeks to hold Jailer Thomas liable in his individual capacity for deliberate indifference based on his position as the county jailer. Specifically, Winkler argues that Jailer Thomas was "responsible for establishing adequate policies and procedures," that "[h]e was responsible for the selection of the jail medical provider," and that "[h]e was responsible for the employment, training, [and] supervision of[] the officers, employees and independent contractors" at the Detention Center. (DE 160, at 30). In making this argument, Winkler relies on this Court's previous decision in *Rice v. Montgomery Cty*. In that case, the Court found that a deliberate indifference claim against Eric Jones, jailer for Montgomery County Regional Jail, withstood summary judgment. 2016 WL 2596035, at *9.

But this case is easily distinguished on the facts and on the law. In *Rice*, the Court found Jailer Jones' deliberate indifference stemmed from what he actually knew and did not do in response to the inmate. It noted that a nursed "informed" him of the inmate's condition and that he was "instructed" to call her or 911 if the inmate's condition worsened. *Id*. at *9. The Court then concluded that "a juror could find Jones' failure to pass these instructions on to his deputies constituted deliberate indifference . . . ." *Id*. Here, there is nothing in the record to indicate that Jailer Thomas knew of Hacker's serious medical need or that he was in any way involved in Hacker's treatment other by virtue of his position as the county jailer. Thus, *Rice* is factually inapplicable.

Unlike *Rice*, Winkler's claim against Jailer Thomas, when properly construed, is less concerned with Jailer Thomas' conduct specific to Hacker, but is rooted in Jailer Thomas' alleged liability in his supervisory role as the county jailer. As a jailer sued in his individual capacity, Jailer Thomas may only be personally liable on a § 1983 claim to the extent of his personal involvement. The doctrine of *respondeat superior*, or the right to control employees,

does not apply in § 1983 actions to impute liability onto supervisors. *Monell v. New York City Dept. of Soc. Servs.*, 436 U.S. 658, 691 (1978); *Taylor v. Mich. Dep't of Corr.*, 69 F.3d 76, 80–81 (6th Cir. 1995); *Bellamy v. Bradley*, 729 F.2d 416, 421 (6th Cir. 1984). Rather, to establish supervisory liability in a § 1983 action, "[t]here must be a showing that the supervisor encouraged the specific incident of misconduct or in some other way directly participated in it." *Bellamy*, 729 F.2d at 421 (citing *Hays v. Jefferson Cty.*, 668 F.2d 869, 872–74 (6th Cir. 1982)).

As stated above, Jailer Thomas did not directly participate in the events related to Winkler's claim. Further, there is no evidence that Jailer Thomas somehow implicitly authorized or acquiesced in a deprivation of proper medical care. *See Hicks v. Frey*, 992 F.2d 1450, 1455 (6th Cir. 1993) (finding, "at a minimum," a government official must have "at least implicitly authorized, approved, or knowingly acquiesced in the unconstitutional conduct" in order to be held liable).

To the extent that Winkler argues that Jailer Thomas should be held individually liable because he failed to promulgate adequate jail policies and because he failed to properly train the jail staff, those arguments fall short. The Sixth Circuit has held that a prison supervisor can be held individually liable for failing to adopt and implement operating procedures "in the face of actual knowledge of a breakdown in the proper workings of the department." *Taylor v. Michigan Dep't. of Corrections*, 69 F.3d 76, 81 (6th Cir. 1995). The Sixth Circuit has clarified this to mean that "it [is] the defendant supervisors' active engagement in a function of their position that directly resulted in the injury to the plaintiff[]." *Essex v. Cty. of Livingston*, 518 F. App'x 351, 355 (6th Cir. 2013). The record contains no evidence to tie Jailer Thomas' conduct (in whatever form that may be) to Hacker's alleged injury, nor has Winkler herself directed the Court to any such evidence. Thus, because the facts do not show any personal involvement on the part of Jailer Thomas,

Winkler cannot establish a constitutional violation based on an individual capacity supervisory liability theory. Therefore, Jailer Thomas, in his individual capacity, is entitled to summary judgment on the deliberate indifference claim.

B. Winkler's § 1983 Claim Against Madison County

Winkler seeks to hold Madison County liable for the deliberate indifference of the ACH defendants and also seeks to hold the county liable for its failure to train the individual Madison County defendants. Both theories of liability fail.

Winkler first asserts that Madison County is responsible for the deliberate indifference of the ACH defendants because the county specifically delegated decision-making authority regarding inmate treatment to ACH. In support, she cites *Pembaur v. Cincinnati*, 475 U.S. 469, 480 (1986), and *St. Louis v. Praprotnik*, 485 U.S. 112 (1988). Winkler does little else to argue how these cases apply or to argue how Madison County is responsible for the deliberate indifference of the ACH defendants. Thus, Winkler has waived the argument. *See McPherson v. Kelsey*, 125 F.3d 989, 995–96 (6th Cir. 1997) ("Issues adverted to in a perfunctory manner, unaccompanied by some effort at developed argumentation, are deemed waived. It is not sufficient for a party to mention a possible argument in the most skeletal way, leaving the court to put flesh on its bones."). Nevertheless, the argument is unpersuasive because Winkler's claim is based on Madison County's delegation of treatment-related decisions and is not that Madison County vested within ACH authority to make all policy decisions. *See Finn*, 2012 WL 3066586, at *18 (discussing *Johnson v. Hardin Cty.*, 908 F.2d 1280 (6th Cir. 1990), which stands for the proposition that "[t]he power of an official to make final decisions regarding questions involving a particular subject matter, in and of itself, is not necessarily enough to establish a local government's liability"); *Graham v. Cty. of Washtenaw*, 358 F.3d 377, 384 (6th Cir. 2004). Thus, her first argument fails as a matter of law.

Winkler's argument seeking to hold Madison County liable for the actions of the ACH defendants fails too for the same reason that her failure-to-train argument fails: there is no underlying unconstitutional conduct by any of the individual defendants in this case. Without any predicate constitutional violations, Winkler's derivative failure-to-train claim against Madison County must fail. Despite Winkler's citations to out-of-circuit case law, the law in the Sixth Circuit is well established that if "no constitutional violation by the individual defendants is established, the [governmental] defendants cannot be held liable under § 1983." *Watkins v. City of Battle Creek*, 273 F.3d 682, 687 (6th Cir. 2001); *Baynes v. Cleland*, 799 F.3d 600, 622 (6th Cir. 2015) ("Baynes failed to present facts upon which a reasonable juror could conclude that the individual defendants' conduct constituted deliberate indifference to a serious medical need under the Eighth Amendment. Without an underlying unconstitutional act, Baynes' claim against the County under § 1983 must also fail."); *Grabow v. Cty. of Macomb*, 580 F. App'x 300, 311–12 (6th Cir. 2014) (affirming the trial court's grant of summary judgment to the county-defendant where plaintiff failed to present facts upon which a reasonable juror could conclude the inmate's Eighth and Fourteenth Amendment rights to adequate medical care were violated, noting that "[a]bsent an underlying constitutional violation, [plaintiff's] claim against the county under § 1983 must also fail") (internal citations omitted); *Perez v. Oakland Cty.*, 466 F.3d 416, 431 (6th Cir. 2006) ("Perez Sr. must identify an Oakland County policy or custom that demonstrated deliberate indifference to the serious mental health needs of inmates at the County Jail. *Liability would rest, if at all, on the actions of Rice in the context of the County's policy, since we found that she violated Perez's Eighth Amendment rights*.") (citing *Watkins*, 273 F.3d at 687) (emphasis added); *see also McQueen v. Beecher Cmty. Schs.*, 433 F.3d 460, 470 (6th Cir. 2006) ("a prerequisite of supervisory liability under § 1983 is unconstitutional conduct by a subordinate of the supervisor"). Therefore, Madison County is entitled to summary judgment.

C. <u>Winkler's § 1983 Claim Against Advanced Correctional Healthcare</u>

Winkler argues that ACH was deliberately indifferent because it failed to provide timely and appropriate medical care to Hacker and other inmates. (DE 162, 36). As a private corporation in the § 1983 context, ACH can be held liable under theories similar to municipal liability. *See Hicks v. Frey*, 992 F.2d 1450, 1458 (6th Cir. 1993) ("It is clear that a private entity which contracts with the state to perform a traditional state function such as providing medical services to prison inmates may be sued under § 1983 as one acting 'under color of state law.'"). However, for ACH to be liable, Hacker must identify some custom, policy, or procedure that caused a violation of her Fourteenth Amendment rights. S*ee Grose v. Corr. Med. Servs., Inc.*, 400 F. App'x 986, 989 (6th Cir. 2010) (citing *Perez*, 466 F.3d at 430)). Winkler's claim against ACH must fail because there are no underlying constitutional violations in this case. *Rouster*, 749 F.3d at 454 ("Rouster is unable to prove that Jerry's constitutional rights were violated. Therefore, we need not consider whether Secure Care's [a private corporation] staffing or training policies might have caused such a violation."). ACH is therefore entitled to summary judgment.

D. <u>Remaining State Law Claims</u>

Having found no constitutional violations, summary judgment has been granted on all § 1983 claims      in favor of all of the defendants in this case. The § 1983 claims served as the sole basis for federal jurisdiction. Now without a federal hook, the Court declines to exercise supplemental jurisdiction over Winkler's state law claims. As has been shown above, there are significant state-law related issues in this case all related to complex and sensitive issues regarding negligence and medical care for prisons. The state courts, as a "surer-footed read[er] of applicable law," are best suited to resolve them. *United Mine Workers of Am. v. Gibbs*, 383 U.S. 715, 726 (1966); *Moon v. Harrison, Piping Supply*, 465 F.3d 719, 728 (6th Cir. 2006) (citation omitted) ("[A] federal court that has dismissed a plaintiff's federal-law claims

should not ordinarily reach the plaintiff's state-law claims."); *see also Rouster*, 749 F.3d at 454 (upholding a district court's decision to decline supplemental jurisdiction over remaining state-law claims after the district court disposed of constitutional deliberate indifference claims). Winkler may pursue the remaining claims in the appropriate state court.

## V. CONCLUSION

To say that this is a tragic case would be a gross understatement. A young man lost his life while incarcerated, despite his protestations and despite attempts from both jail and medical to treat him. Hacker's death may well have been avoided. Had jail officials and medical personnel known what was truly ailing Hacker, they may have been able to save his life, or, perhaps, different decisions would have been made in the crucial hours. "But the Fourteenth Amendment does not permit claims against jail officials [and medical professionals] for negligence, that is, claims regarding what [they] *should* have known or *should* have done." *Scott*, 639 F. App'x at 361 (emphasis in original). Rather, the Constitution focuses on the defendant's mental state to isolate those defendants who inflict punishment because, after all, the "Eighth Amendment [and the Fourteenth Amendment corollary] . . . outlaws cruel and unusual 'punishments.'" *Farmer*, 511 U.S. at 837. "[A]n official's failure to alleviate a significant risk that he should have perceived but did not, while no cause for commendation, cannot under our cases be condemned as the infliction of punishment." *Id.* at 838. On this narrow question—whether any of the defendants knew of and consciously disregarded a substantial risk of harm—the Court cannot answer in the affirmative. This is not to say that Winkler is without a remedy. But under the facts in the record and considering them in the light most favorable to her, such a remedy cannot be found under the rights afforded by the Constitution.

Accordingly, being otherwise sufficiently advised, **IT IS ORDERED**:

(1) The 42 U.S.C. § 1983 claim against all Defendants are **DISMISSED WITH PREJUDICE**;

(2) The state law claims against all Defendants are **DISMISSED WITHOUT PREJUDICE**;

(3) All remaining motions are **DENIED** as **MOOT**;

(4) A separate Judgment will be entered contemporaneously with this Opinion and Order; and

(5) This matter shall be **STRICKEN** from the Court's active docket.

Dated August 18, 2017.

KAREN K. CALDWELL, CHIEF JUDGE
UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF KENTUCKY