RECOMMENDED FOR FULL-TEXT PUBLICATION
Pursuant to Sixth Circuit I.O.P. 32.1(b)

File Name: 18a0123p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

———————————

CHAROLETTE DIANA WINKLER, Administratrix of
the Estate of Brandon Clint Hacker, Deceased,

*Plaintiff-Appellant*,

*v.*

No. 17-6073

MADISON COUNTY, KENTUCKY; DOUG THOMAS,
individually;   ADVANCED   CORRECTIONAL
HEALTHCARE;   NADIR   H.   AL-SHAMI,   M.D.,
individually;   LAYLA   TROUTMAN,   ARNP,
individually; ARLENE JOHNSON, LPN, individually;
TOM   JONES,   individually;   CORY   DUNNING,
individually; J. J. LAGRANGE, individually; KEITH
TRICKLER,   individually;   WHITNEY   BRATCHER,
individually,

*Defendants-Appellees*.

———————————

Appeal from the United States District Court
for the Eastern District of Kentucky at Lexington.
No. 5:15-cv-00045—Karen K. Caldwell, Chief District Judge.

Argued:  April 25, 2018

Decided and Filed:  June 26, 2018

Before:  GILMAN, COOK, and GRIFFIN, Circuit Judges.

———————————

## COUNSEL

**ARGUED:**  Jerome P. Prather, GARMER & PRATHER, PLLC, Lexington, Kentucky, for
Appellant.  D. Barry Stilz, KINKEAD & STILZ, PLLC, Lexington, Kentucky, for Madison
County Appellees.  Andie Brent Camden, O'BRYAN, BROWN & TONER, PLLC, Louisville,
Kentucky, for Advanced Correctional Healthcare Appellees.  **ON BRIEF:**  Jerome P. Prather,
William R. Garmer, John E. Norman, GARMER & PRATHER, PLLC, Lexington, Kentucky, for
Appellant.  D. Barry Stilz, Robert C. "Coley" Stilz III, Lynn Sowards Zellen, KINKEAD &
STILZ, PLLC, Lexington, Kentucky, for Madison County Appellees.  Andie Brent Camden,

O'BRYAN, BROWN & TONER, PLLC, Louisville, Kentucky, for Advanced Correctional Healthcare Appellees.

_____

## OPINION

_____

RONALD LEE GILMAN, Circuit Judge.  The tragic events in this case occurred during Brandon Clint Hacker's five-day pretrial detention at the Madison County Detention Center. Hacker arrived at the Detention Center on Wednesday, April 30, 2014, after he was arrested by local law enforcement for failure to appear at a child-support hearing.  He died of a perforated duodenal ulcer five days later on Monday, May 5, 2014.

Charolette Diana Winkler, Hacker's mother and the Administrator of his estate, brought suit against Madison County and the Detention Center's contract medical provider, Advanced Correctional Healthcare, Inc. (Healthcare), as well as against jail personnel and members of Healthcare's medical staff.  She alleged several state-law tort claims in addition to a claim that the defendants violated Hacker's constitutional right to adequate medical care.

With regard to the constitutional claim, the district court granted summary judgment in favor of all the defendants, concluding that the record would not support a jury finding that any of them were deliberately indifferent to Hacker's serious medical needs.  It then declined to exercise supplemental jurisdiction over the remaining state-law claims and dismissed those claims without prejudice.  Winkler appeals the grant of summary judgment.  For the reasons set forth below, we **AFFIRM** the judgment of the district court.

## I.  BACKGROUND

### A.    Factual background

#### 1.    *The Detention Center and Healthcare*

The Detention Center is operated by Madison County, Kentucky.  Through Jailer Doug Thomas, the County entered into an agreement with Healthcare to provide medical care to

inmates housed at the Detention Center. This agreement was in effect at all times relevant to this lawsuit.

Healthcare in turn entered into a contract with Dr. Nadir H. Al-Shami to be the staff physician at several county jail facilities, including the Detention Center. His duties included providing "on-site inmate medical care and treatment, case management and documentation, 24/7 physician call, and supervision of on-site medical staff." Dr. Al-Shami lived in Louisville, but would generally visit the Detention Center once a week. When Dr. Al-Shami was not present at the Detention Center, he was on call 24 hours a day to address inmate medical needs over the phone. Layla Troutman, a nurse practitioner living in Los Angeles, California, was available by phone as a back-up medical provider if Dr. Al-Shami could not be reached by the Detention Center staff.

As part of its contract with the County, Healthcare was also required to provide on-site nursing coverage for up to 40 hours per week. Arlene Johnson, a licensed practical nurse (LPN), provided these nursing services, working at the Detention Center Monday through Friday from 8:00 a.m. to 4:00 p.m. Aside from Dr. Al-Shami, Nurse Troutman, and Nurse Johnson, no other medical professionals provided care at the Detention Center at any time relevant to this case.

An inmate at the Detention Center could request medical care by filling out a sick-call-request form. These forms were collected daily by the deputy jailer on duty, who delivered them to Nurse Johnson. After Nurse Johnson received a request, she would have the inmate brought to her, and she would gather information about the inmate's complaints and take the inmate's vital signs. She would not conduct a physical examination because she was not qualified to do so as an LPN.

Nurse Johnson would then call Dr. Al-Shami or Nurse Troutman to relay the information gathered and receive an order for treatment. (Winkler contends that the record shows that Nurse Johnson failed to contact a supervising medical provider with regard to complaints from a substantial number of inmates, but there is no dispute that she called her supervisors each time that she saw Hacker.) Nurse Johnson never created or initiated treatment plans herself. Deputy jailers were required to follow all instructions from the medical staff related to treatment, but had

the authority to transport an inmate to the hospital without approval from the medical staff in the event of an emergency.

### 2.      *April 30–May 2, 2014*

After his arrest on April 30, Hacker was transported to the Detention Center.  As part of the booking process, Captain Tom Jones asked Hacker a series of medical questions.  Hacker told Captain Jones that he did not have any "serious medical condition" requiring attention during his detention.  He also said that (1) he had not ingested dangerous levels of drugs or alcohol, (2) he had never experienced delirium tremens or other serious withdrawal, and (3) it was not possible that he would go through withdrawal during his detention.  Hacker was then placed in a cell designated for the general jail population.

The first medical request by Hacker came two days later, on Friday, May 2.  In the section of the form inquiring into the reason for the request, Hacker wrote:  "very sick, stomach meds."  Nurse Johnson saw Hacker at 1:50 p.m. that same day, took his vital signs, and noted on Hacker's progress note that he had elevated blood pressure and was suffering from "active tremors, body aches, [and] sweats."  The progress note further stated that Hacker complained of being shaky and having chills, as well as having an upset stomach.  Hacker also told Nurse Johnson that he was withdrawing from heroin, something that he had not previously disclosed to anyone at the Detention Center.

Nurse Johnson attempted to reach Dr. Al-Shami by phone, but he was unavailable.  She next called Nurse Troutman and was able to relay the information that she had gathered.  Nurse Troutman diagnosed Hacker's symptoms as reflecting "possible withdrawal from heroin," so she prescribed the medications Clonidine, Vistaril, and Bentyl.  She instructed Nurse Johnson to follow up as needed.  The treatment plan was recorded by Nurse Johnson.

There is no evidence in the record that Nurse Johnson or Nurse Troutman inquired into the frequency of Hacker's heroin use or the amount that he had ingested, a failure that constituted a violation of medical protocols in place at the Detention Center.  Nor did they document the date of Hacker's most recent use of heroin or order an opiate-withdrawal screening to confirm his self-report.

Hacker was subsequently returned to his cell in the general jail population with instructions to increase his rest and fluid intake. Nurse Johnson then left for the weekend without discussing Hacker's condition with jail personnel or otherwise instructing them to monitor Hacker's condition in her absence.

In accordance with Detention Center policy, a deputy jailer reviewed a book where Nurse Johnson noted prescriptions ordered for the inmates. Hacker's prescribed medications, as well the medications for the other inmates, were then "packed" by Deputy Whitney Bratcher. These medications were provided to Hacker over the weekend by a male jailer, although records indicate that Hacker was given only half of the prescribed dose.

### 3.     *May 3, 2014*

Hacker did not fill out a sick-call-request form on Saturday, May 3. Nor is there any evidence that he otherwise requested medical care from jail personnel. The record, however, shows that his condition deteriorated. Another inmate, Steven Denny, testified during his deposition that both he and Hacker went to the visitation room at the same time on that Saturday evening, and that he guided Hacker by the arm and helped him up the steps to the room because Hacker "was kind of weak" and "didn't feel good." As they walked to the room, they discussed the fact that Hacker had ulcers and regularly used heroin. As Denny explained, Hacker "just looked sick. I just told him it was dope or ulcers or something. Somethings killing you. Better do something."

But Denny did not think that he needed to contact jail personnel about Hacker's condition at that time, nor did Hacker tell Denny that he wished to see the medical staff. There were no jail personnel in the room during visitation. The room, however, was visible from a control tower so that visitation could be monitored.

Hacker's friend, James Potter, visited Hacker that Saturday night. Potter was with Hacker for 20 minutes, and he later testified that Hacker's condition appeared to be consistent with Potter's own experience of opiate withdrawal. He said that "anybody that's been through detox would know that [Hacker's condition] was detox, or would think [it]." Hacker was pale and sweaty, and he was crunched over like he was experiencing abdominal pain. When Potter

asked him if he was okay, Hacker said that he was detoxing and that the detox medicine was not enough.  Hacker did not tell Potter of any intention to get additional medical care, but did tell Potter that "You can't get no help around here."

Hacker's girlfriend, Tiffany Gibson, was also housed at the Detention Center on May 3.  Because she knew when Potter was going to visit Hacker, she called Potter during the visit and passed messages to Hacker through Potter.  According to Gibson, Potter told her that Hacker "felt deathly ill" and "looked real bad."  Gibson had seen Hacker detox on previous occasions, but was unaware that he suffered from ulcers.

### 4.    May 4, 2014

On Sunday, May 4, Hacker notified jail personnel of his need for medical attention in multiple ways.  He completed a sick-call-request form in which he wrote:  "Blood Pressure[.] Need to see A.S.A.P. Having trouble breathing, stomach problems."  The record does not reflect at what time this request was made, to whom it was given, or if the information on the form was ever reported to the medical staff.

Around 1:00 p.m. that day, Hacker sought the attention of jail personnel at the door of his cell.  Deputy Jailer Jeremy LaGrange responded, and Hacker informed LaGrange that "he wasn't feeling well[,] that . . . he couldn't keep anything down[,] and [that] he thought he was going to be dope sick."  As a result, Deputy LaGrange brought Hacker to booking, where he explained the situation to Captain Jones.  Captain Jones then instructed Deputy LaGrange to contact Dr. Al-Shami.

Deputy LaGrange spoke with Dr. Al-Shami for about five minutes and relayed Hacker's condition and his vital signs.  Dr. Al-Shami instructed Deputy LaGrange to give Hacker the medications Vistaril, Bentyl, and Phenergan.  Because Hacker's blood pressure had returned to normal, the blood-pressure medication Clonidine was not prescribed.  Deputy LaGrange did not personally check on Hacker again that day.

Around 3:00 p.m., Hacker made an oral complaint to Deputy Greg Evans and Captain Jones, stating that his stomach hurt and that he "felt like he was bleeding on the inside."  Captain

Jones then called Dr. Al-Shami directly and relayed this information, as well as Hacker's up-to-date blood-pressure reading. Dr. Al-Shami responded by telling Captain Jones that internal bleeding does not cause pain and advised him to monitor Hacker. But Dr. Al-Shami did not provide any specifics about how to monitor Hacker or change his treatment plan. Hacker was returned to his general-population cell. Captain Jones finished his shift soon after the call, but he passed along to Deputy Evans the general instruction to monitor Hacker.

Hacker also called his grandmother, Helen Hacker, three or four times on that Sunday afternoon. According to Ms. Hacker, he was crying and desperate. He told her, "my stomach is killing me, I need to go to the hospital." Ms. Hacker later called booking at the Detention Center and explained the phone calls that she had just had with her grandson, asking jail personnel to "please take care of him." According to Ms. Hacker, the individual on the other end of the line told her that jail personnel were "looking after" her grandson. The record does not identify this individual.

### 5.     *May 5, 2014*

Hacker's next interaction with jail personnel occurred around 3:00 a.m. on Monday, May 5. Captain Keith Trickler was distributing the inmates' medication. (Trickler returned to the rank of Deputy, which he presently holds, in October 2014. He requested the reduction in rank so that he could work an earlier shift at the Detention Center.) When Captain Trickler went to give Hacker his medication, Hacker was sitting on a table in his cell. Captain Trickler asked what was wrong, and Hacker told him that "he was really going through it." Hackler further explained that his stomach was upset, that he had been doing drugs for a while, and that he was "pill sick" (meaning that he was suffering from withdrawal). According to Captain Trickler, Hacker's appearance was consistent, in Captain Trickler's experience, with someone going through opiate withdrawal. Hacker did not ask to see the medical staff, and the other inmates in Hacker's cell informed Captain Trickler that Hacker was already set to see the doctor later that day. As a result, Captain Trickler gave Hacker his prescribed medications but did not report their conversation to the medical staff.

The next interaction between jail personnel and Hacker occurred several hours later, around 5:30 a.m. Deputy Bratcher was bringing breakfast to the inmates in Hacker's cell and, according to Detention Center policy, called each inmate by name to the cell door to receive his meal. Hacker was lying down on a mat on the floor and did not get up when called, so the other inmates in the cell asked Deputy Bratcher if they could get his food for him. Deputy Bratcher did not speak to Hacker or inquire into why he did not get up, nor did she check his vital signs.

She was apparently not concerned because, before breakfast, Captain Trickler had informed Deputy Bratcher about his earlier interaction with Hacker and the fact that Hacker was going through withdrawal and receiving medication. And, according to Deputy Bratcher, it was "not unusual" for inmates to not get up in the morning for breakfast. Deputy Bratcher returned to pick up the breakfast trash an hour later, but did not recall seeing or interacting with Hacker.

Deputy Matt Dees also had an interaction that morning with Hacker that he reported as follows in an incident report:

> Walked by cell inmates pecked on glass[.] I entered cell and inmate [H]acker was sitting in chair. Inmate [Hacker] stated he was having withdraw[al] from heroin and felt very sick. [L]eft cell and Captain Tom Jones told me take him to medical. I helped inmate [H]acker put on t-shirt and walked him to medical. He sat down in chair and nurse was interviewing him and asking him what drugs he was withdrawing from. Nurse asked me to get him some gatorade. Went to kitchen and got 2 cups of gatorade, returned to medical. Inmate starting drinking gatorade and I left right after this occurred and went to tower.

The incident report does not indicate at what time these events occurred.

Captain Jones returned for his shift at 7:00 a.m. that morning. He testified during his deposition that, when Deputy Dees informed him that there was a medical complaint from Hacker's cell, he went "immediately" to see Nurse Johnson "to see if she could see [Hacker] expediently." He also gave her the incident report that had been prepared by Deputy LaGrange and a copy of the order that had been given by Dr. Al-Shami.

Nurse Johnson arrived at around 8:00 a.m. and saw Hacker at approximately 9:25 a.m. In addition to the information provided by Captain Jones, she reviewed Hacker's sick-call-request form from Sunday, May 4, which stated that he was having trouble breathing and needed

medical attention "A.S.A.P."  Nurse Johnson noted that he was "pale," "weak," and "sweaty," with cold hands and moist skin.  Hacker told Nurse Johnson that he "was trying to get through withdrawal on his own," but could not keep any food down.  He also told her that "he hadn't had a bowel movement in a while."  Nurse Johnson noticed track marks on Hacker's arms and asked him what type of drugs he had ingested.  He said heroin.

Nurse Johnson then proceeded to call Dr. Al-Shami, who instructed her to give Hacker Vistaril and Bentyl.  She also attempted to give Hacker Gatorade, but he spilled the drink on his clothes and the floor before laying back on the bed and collapsing, his "eyes roll[ing] to the back of his head."  Because Hacker was unresponsive, Nurse Johnson called for assistance.  She also attempted to revive him using chest rubs and an ammonia inhalant, before using the ambu-bag to assist Hacker's decreased respiration.

Captain Jones called for emergency services, with a team arriving at 9:46 a.m.  Hacker was transferred to the emergency room at the Baptist Health Richmond hospital, where efforts to revive him failed.  He was pronounced dead at 10:47 a.m.  The cause of death was determined to be acute peritonitis as a result of a perforated duodenal ulcer.

## B.    Procedural background

Following Hacker's death, Winkler brought suit against certain jail personnel and Healthcare's medical providers, as well as against the County and Healthcare itself.  She alleged that the defendants were deliberately indifferent to Hacker's serious medical needs, in violation of the Fourteenth Amendment to the U.S. Constitution.  Winkler also brought various state-law claims.  Two motions for summary judgment were filed by the County, Healthcare, and the individual defendants.

The district court granted both motions with regard to the constitutional claim, concluding that the record would not support a jury finding that the defendants were deliberately indifferent to Hacker's serious medical needs.  It then dismissed the remaining state-law claims without prejudice so that they could be filed anew in state court.  This timely appeal followed.

## II. ANALYSIS

### A.      Standard of review

We review de novo the district court's grant of summary judgment.  *Williams v. AT&T Mobility Servs.*, 847 F.3d 384, 391 (6th Cir. 2017).  Summary judgment is proper when there is no genuine dispute of material fact and the moving party is entitled to judgment as a matter of law.  Fed. R. Civ. P. 56(a).  A genuine dispute of material fact exists "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party."  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).  The court "must view all evidence in the light most favorable to the nonmoving party in making this determination."  *Williams*, 847 F.3d at 391.

### B.      The district court did not err in concluding that the record would not support a jury finding that the defendants were deliberately indifferent to Hacker's serious medical needs.

Winkler contends that genuine issues of material fact remain with regard to whether each of the defendants was deliberately indifferent to Hacker's serious medical needs, precluding a resolution of the § 1983 claim at the summary-judgment stage.  "To prevail on a cause of action under § 1983, a plaintiff must prove '(1) the deprivation of a right secured by the Constitution or laws of the United States (2) caused by a person acting under the color of state law.'"  *Shadrick v. Hopkins County*, 805 F.3d 724, 736 (6th Cir. 2015) (quoting *Jones v. Muskegon County*, 625 F.3d 935, 941 (6th Cir. 2010)).  The principle is well settled that private medical professionals who provide healthcare services to inmates at a county jail qualify as government officials acting under the color of state law for the purposes of § 1983.  *Harrison v. Ash*, 539 F.3d 510, 521 (6th Cir. 2008).

#### 1.   Deliberate-indifference standard

"The Eighth Amendment's prohibition on cruel and unusual punishment generally provides the basis to assert a § 1983 claim of deliberate indifference to serious medical needs, but where that claim is asserted on behalf of a pre-trial detainee, the Due Process Clause of the Fourteenth Amendment is the proper starting point."  *Phillips v. Roane County*, 534 F.3d 531, 539 (6th Cir. 2008).  "There are two parts to the claim, one objective, one subjective.  For the

objective component, the detainee must demonstrate the existence of a sufficiently serious medical need." *Spears v. Ruth*, 589 F.3d 249, 254 (6th Cir. 2009) (quoting *Estate of Carter v. City of Detroit*, 408 F.3d 305, 311 (6th Cir. 2005)).   There is no question that Hacker's perforated duodenal ulcer, which ultimately caused his death, met this objective component. *See Rouster v. County of Saginaw*, 749 F.3d 437, 446 (6th Cir. 2014) (concluding that the defendant had a "serious, indeed dire, medical need" when he had a perforated duodenal ulcer that led to his death).

"For the subjective component, the detainee must demonstrate that the defendant possessed a sufficiently culpable state of mind in denying medical care." *Spears*, 589 F.3d at 254 (quoting *Estate of Carter*, 408 F.3d at 311).   A defendant has a sufficiently culpable state of mind if he "knows of and disregards an excessive risk to inmate health or safety." *Farmer v. Brennan*, 511 U.S. 825, 837 (1994).   This means that "the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference." *Id.*

A plaintiff need not show that the defendant acted with the very purpose of causing harm, but must show something greater than negligence or malpractice. *Id.* at 835; *see also Rouster*, 749 F.3d at 446–47 ("The subjective requirement is designed 'to prevent the constitutionalization of medical malpractice claims.'" (quoting *Comstock v. McCrary*, 273 F.3d 693, 703 (6th Cir. 2001))).   The standard, then, has generally been equated with one of "recklessness." *Farmer*, 511 U.S. at 836; *see also, e.g.*, *Shadrick*, 805 F.3d at 737–38.

"[T]he subjective component of a deliberate indifference claim must be addressed for each officer individually." *Phillips*, 534 F.3d at 542 (alterations incorporated) (quoting *Garretson v. City of Madison Heights*, 407 F.3d 789, 797 (6th Cir. 2005)).   So the evidence must show that the specific individual was aware of facts from which he or she could infer a substantial risk of serious harm.   "Whether a prison official had the requisite knowledge of a substantial risk is a question of fact subject to demonstration in the usual ways, including inference from circumstantial evidence, . . . and a factfinder may conclude that a prison official knew of a substantial risk from the very fact that the risk was obvious." *Farmer*, 511 U.S. at 842.

### 2. *Nurse Troutman*

Nurse Troutman's only involvement in Hacker's care occurred when she spoke with Nurse Johnson over the phone on Friday, May 2, 2014. During this call, Nurse Johnson informed Nurse Troutman of the facts that the former had gathered regarding Hacker's condition. Nurse Troutman determined that Hacker was likely suffering from opiate withdrawal and ordered that he be provided with medications intended to treat both the withdrawal and his high blood pressure. Winkler contends that these actions constituted deliberate indifference to Hacker's serious medical needs in two ways: (1) that Nurse Troutman misdiagnosed Hacker without first eliciting sufficient information, as required by relevant Healthcare protocols, and (2) that she failed to order proper monitoring of Hacker's condition.

But this court has made clear that, in order to show deliberate indifference, a plaintiff must allege "more than negligence or the misdiagnosis of an ailment." *Comstock*, 273 F.3d at 703. "When a prison doctor provides treatment, albeit carelessly or inefficaciously, to a prisoner, he has not displayed a deliberate indifference to the prisoner's needs, but merely a degree of incompetence which does not rise to the level of a constitutional violation." *Id.* Nor does the failure to follow internal policies, without more, constitute deliberate indifference. *Meier v. County of Presque Isle*, 376 F. App'x 524, 529 (6th Cir. 2010) (noting than an awareness of a policy and the failure to comply with it "is not a per se constitutional violation"); *Andujar v. Rodriguez*, 486 F.3d 1199, 1204 n.5 (11th Cir. 2007) ("Failure to follow procedures does not, by itself, rise to the level of deliberate indifference because doing so is at most a form of negligence." (quoting *Taylor v. Adams*, 221 F.3d 1254, 1259 (11th Cir. 2000))).

Rather, Winkler must show that Nurse Troutman was subjectively aware of information from which she could have inferred a substantial risk to Hacker's health, and that she acted with reckless disregard to that risk. *See Rouster*, 749 F.3d at 447 (noting that the plaintiff bears the burden of proving subjective knowledge). Winkler has not done so. The record shows that Nurse Troutman believed, based on the information provided to her (including Hacker's self-reports), that Hacker was suffering solely from opiate withdrawal.

She then prescribed medication to treat that condition and instructed Nurse Johnson to follow up as needed.  Although hindsight shows that the more prudent approach would have been for Nurse Troutman to gather additional information about Hacker's apparent withdrawal and to provide more detailed monitoring instructions, "[c]ourts are generally reluctant to second guess the medical judgment of prison officials." *Rouster*, 749 F.3d at 448 (quoting *Jones v. Muskegon County*, 625 F.3d 935, 944 (6th Cir. 2010)).  Instead, this court has found deliberate indifference on the part of medical staff under comparable circumstances only where "medical care . . . is so cursory as to amount to no treatment at all." *Terrance v. Northville Reg'l Psychiatric Hosp.*, 286 F.3d 834, 843–44 (6th Cir. 2002) (quoting *Mandel v. Doe*, 888 F.2d 783, 789 (11th Cir. 1989)); *cf. LeMarbe v. Wisneski*, 266 F.3d 429, 439 (6th Cir. 2001) ("A government doctor has a duty to do more than simply provide some treatment to a prisoner who has serious medical needs; instead the doctor must provide medical treatment to the patient without consciously exposing the patient to an excessive risk of serious harm.").  Nothing in the record here supports a conclusion that Nurse Troutman consciously exposed Hacker to such a risk.

The circumstances of this case are in fact strikingly similar to those in *Rouster v. County of Saginaw*, 749 F.3d 437 (6th Cir. 2014).  Like Hacker, the decedent in *Rouster* died due to a perforated duodenal ulcer while in detention.  A medical assistant at the jail had interpreted the decedent's symptoms and complaints of stomach pain as indicative of a relatively minor condition—gas and diarrhea.  In line with this conclusion, the medical assistant provided the decedent with Tums and returned him to his general-population cell with instructions to lie on his side.  This court concluded that the record failed to show that the medical assistant was aware of a substantial risk to the decedent's health, noting that she "did not have one very critical piece of information . . . :  she did not know that [the decedent] had been treated the previous year for a perforated duodenal ulcer." *Id.* at 448.  Summary judgment was accordingly upheld in favor of the medical assistant. *Id.* at 451.

Winkler similarly identifies no facts that would have alerted Nurse Troutman to Hacker's ulcer condition or to the fact that her diagnosis of opiate withdrawal was incorrect.  In fact, Winkler does not dispute that Hacker's symptoms, as reported to Nurse Troutman, were

consistent with opiate withdrawal.  Although Nurse Troutman's assessment and treatment of Hacker might not represent the best of medical practices, her actions do not suggest deliberate indifference to a known risk to Hacker's health.  *See id.* at 449 (noting that the "failure to follow best medical practices is not necessarily evidence of deliberate indifference" if the individual was not aware of the serious medical ailment causing the symptoms).

### 3. *Dr. Al-Shami*

Dr. Al-Shami first became involved in Hacker's medical care on Sunday, May 4, when Deputy LaGrange called him to report that Hacker was "dope sick" and "couldn't keep anything down," and to convey Hacker's current vital signs.  To treat Hacker's purported opiate withdrawal, Dr. Al-Shami prescribed Vistaril, Bentyl, and Phenergan.

None of these facts supports a conclusion that Dr. Al-Shami had reason to believe that Hacker was suffering from anything else.  Dr. Al-Shami did not ignore Hacker's distress, but rather provided medication to address the condition that Dr. Al-Shami believed Hacker was suffering from.  *See Jones*, 625 F.3d at 945 ("Generally, courts find deliberate indifference where there is evidence tending to establish that the physician is present while the inmate is in distress, that distress is communicated to the physician, and the physician purposefully ignores the distress knowing that an adverse outcome is likely to occur.").  The record instead supports the proposition that Dr. Al-Shami took steps to address what he believed to be the actual risk to Hacker's health.

Winkler contends that there is a genuine dispute of material fact as to whether Dr. Al-Shami was made aware of Hacker's sick-call request stating that he was having trouble breathing and needed help immediately.  Although this sick-call request is dated May 4, the time at which it was filled out is unknown, meaning that it could have been completed after the calls to Dr. Al-Shami.  Moreover, Winkler identifies no facts that would support the conclusion that Dr. Al-Shami had seen this request or been advised of its contents prior to Hacker's death.  Dr. Al-Shami testified during his deposition that he was not aware of this specific request.  And Deputy LaGrange and Captain Jones similarly denied being aware of the request, let alone sharing its contents with Dr. Al-Shami.

Two hours after the first call, Captain Jones called Dr. Al-Shami again on May 4 to report that Hacker continued to experience stomach pain and that Hacker believed that he was suffering from internal bleeding.  Like the first call, this second call does not support a conclusion that Dr. Al-Shami was deliberately indifferent to Hacker's serious medical needs.  Dr. Al-Shami noted that internal bleeding does not cause pain and that most individuals do not know when they are suffering from internal bleeding, although some individuals may vomit blood or have a dark stool.  Nothing in the record suggests that Hacker exhibited either symptom.  Dr. Al-Shami accordingly ruled out the possibility that Hacker was suffering from internal bleeding and decided to continue the course of treatment to address Hacker's chief complaint of stomach pain, which the record shows that he attributed to Hacker's self-reported opiate withdrawal.  After Dr. Al-Shami instructed Captain Jones to continue monitoring Hacker, albeit without providing specifics, Hacker was returned to his cell.

Although Dr. Al-Shami's decision not to investigate further into what was causing Hacker's symptoms might have been negligent, *see Comstock v. McCrary*, 273 F.3d 693, 703 (6th Cir. 2001), it does not show that Dr. Al-Shami "consciously expos[ed]" Hacker to a risk of serious harm, *see LeMarbe v. Wisneski*, 266 F.3d 429, 439 (6th Cir. 2001).  Hacker, after all, had self-reported that he was going through opiate withdrawal, and Winkler appears to concede that Hacker's symptoms were consistent with such a diagnosis.  Dr. Al-Shami thus had no reason to suspect that Hacker was suffering from anything other than opiate withdrawal.  *See Rouster*, 749 F.3d. at 451 (noting that if the inmate's "symptoms had been clearly inconsistent with alcohol withdrawal, [the LPN] might have been deliberately indifferent by failing to confirm that his symptoms were not indicative of a different and more serious condition").  Rather, Dr. Al-Shami was lacking "critical" information that could have alerted him to the possibility that Hacker's symptoms were caused by an ulcer.  *Id*. at 448.

Winkler further argues that Dr. Al-Shami's failure to provide *detailed* monitoring instructions constituted deliberate indifference.  Although providing detailed instructions would undoubtedly have been prudent, the failure to do so does not show the necessary conscious exposure of a patient to an excessive risk of serious harm.  *See LeMarbe*, 266 F.3d at 439 ("[T]he

doctor must provide medical treatment to the patient without consciously exposing the patient to an excessive risk of serious harm.").

In sum, we conclude that the record would not support a jury finding that Dr. Al-Shami acted with deliberate indifference to Hacker's serious medical needs.  *See Briggs v. Oakland County*, 213 F. App'x 378, 385 (6th Cir. 2007) (concluding that the record did not show deliberate indifference where the nurse "perceived a lesser risk of serious harm to [the inmate's] health" (heroin withdrawal) than what he was actually suffering from (internal bleeding) and acted according to that belief).

### 4.  *Nurse Johnson*

Winkler also contends that Nurse Johnson exhibited deliberate indifference to Hacker's serious medical needs when she saw him on Friday, May 2, in response to his first sick-call request.  The focus of Winkler's argument is that Nurse Johnson failed to follow various opiate-withdrawal and abdominal-discomfort protocols in place at the time.  But as discussed above, the failure to follow internal policies does not alone establish that an individual acted with deliberate indifference.  *Meier v. County of Presque Isle*, 376 F. App'x 524, 529 (6th Cir. 2010).

Nor does the record otherwise indicate that Nurse Johnson inferred a substantial risk to Hacker's health and disregarded that risk.  Nurse Johnson saw Hacker on May 2, gathered information about his symptoms and medical history, and took his vital signs.  She then placed a call to Dr. Al-Shami and, when she could not reach him, called Nurse Troutman.  After relaying the information that she had gathered, she received an order from Nurse Troutman to provide Hacker with medications intended to treat high blood pressure and opiate-withdrawal symptoms, which was consistent with Hacker's vitals and his self-reports of opiate withdrawal.  This information was recorded so that jail personnel could "pack" and provide the medication to Hacker over the weekend.

Winkler argues that Nurse Johnson should have gathered more information about Hacker's condition and instructed jail personnel to monitor him before leaving.  Although Nurse Johnson's actions might have fallen below a reasonable standard of care, she did not disregard Hacker's complaints.  She instead gathered information about his condition, provided it to a

medical professional qualified to evaluate him, and followed the directions of that medical professional.  Nothing in these facts suggests that Nurse Johnson perceived that Hacker was suffering from anything other than opiate withdrawal.

Because Nurse Johnson believed that Hacker would be treated for withdrawal following Nurse Troutman's orders, there is no basis to find that she was subjectively aware of a substantial risk of harm to Hacker's health.  *Cf. Sours v. Big Sandy Reg'l Jail Auth.*, 593 F. App'x 478, 485–86 (6th Cir. 2014) (concluding that the record could support a finding of deliberate indifference where the nurse was aware that the inmate had elevated blood sugar levels due to his diabetes, but failed to contact a physician, administer insulin, find out the inmate's regular insulin dose, or provide anything more than vague instructions to jail personnel to monitor his blood-sugar levels prior to meals before she left for a long weekend).

### 5.  *Deputy LaGrange*

Winkler next contends that Deputy LaGrange displayed deliberate indifference to Hacker's serious medical needs because Deputy LaGrange failed to collect adequate information about Hacker's condition before calling Dr. Al-Shami, and because he allegedly withheld information from Dr. Al-Shami during the call.  With regard to the first contention, Winkler argues that Deputy LaGrange should have obtained "any history related to [Hacker's] complaints" and "checked [Hacker's] vital signs" before calling Dr. Al-Shami.  But Winkler admits that Deputy LaGrange recorded Hacker's blood pressure at the time of the call, and she does not specifically identify any other vital signs that Deputy LaGrange, who is not a medical professional, should have recorded.  Moreover, she fails to explain how Deputy LaGrange displayed deliberate indifference by failing to inquire into Hacker's medical history.

The record in fact indicates that Deputy LaGrange responded immediately to Hacker's complaints and took reasonable action.  As soon as he learned of Hacker's symptoms, Deputy LaGrange brought the information to the attention of his supervisor, Captain Jones.  Pursuant to Captain Jones's instruction, Deputy LaGrange promptly called Dr. Al-Shami and reported what he knew about Hacker's symptoms.  The record also shows that Deputy LaGrange carried out the treatment order given by Dr. Al-Shami during the call.

There is no evidence in the record that Dr. Al-Shami asked Deputy LaGrange to obtain any additional information (vital signs or history), let alone that the deputy failed to comply with such a request.  Deputy LaGrange was entitled to rely on Dr. Al-Shami's apparent conclusion that no additional information about Hacker's condition was needed.  *See McGaw v. Sevier County*, 715 F. App'x 495, 498–99 (6th Cir. 2017) ("Where, as here, an officer responds to a substantial risk of serious harm by asking for and following the advice of a professional [that] the officer believes to be capable of assessing and addressing that risk, then the officer commits no act of deliberate indifference in adhering to that advice."); *see also Spears v. Ruth*, 589 F.3d 249, 255 (6th Cir. 2009) (concluding that nonmedical jail personnel are entitled to reasonably rely on the assessments made by the medical staff).

Nor does the record show that Deputy LaGrange withheld any information about Hacker's condition when he spoke with Dr. Al-Shami.  Deputy LaGrange's incident report from May 4 states that he told Dr. Al-Shami that Hacker was "sick to his stomach," "could not keep anything down," and was "dope sick."  The report also states that Dr. Al-Shami advised him to give Hacker three medications, but that Clonidine was not given because Hacker's "blood pressure was 110/70," a normal reading.  During his deposition, Dr. Al-Shami testified that he did "not necessarily" receive all of the information in the incident report.  But further reading shows that Dr. Al-Shami confirmed that Deputy LaGrange told him about Hacker's stomach pain and that he could not keep anything down.

Dr. Al-Shami's only critique of the incident report was that Deputy LaGrange had misspelled or copied incomplete names of the relevant prescription drugs.  The doctor further noted that he had not ordered Clonidine or discussed that drug with Deputy LaGrange, remarking that this medication was likely discontinued prior to the call.  But this assertion does not contradict Deputy LaGrange's incident report.  So despite Winkler's argument to the contrary, there is nothing in the record to support a finding that Deputy LaGrange withheld information from Dr. Al-Shami.

### 6. *Captain Dunning*

The record contains very little information about Captain Dunning.  Captain Dunning worked the second shift on Sunday, May 4, arriving at 3:00 p.m. and leaving at 11:00 p.m. Captain Jones, who worked the immediately preceding shift, said that he "advised Captain Dunning at shift change of inmate Hacker and several other medical complaints that had occurred."  During his deposition testimony, Captain Dunning asserted that he did not remember being told about Hacker's condition before starting his shift, but that "it could have [happened]."

Assuming that it did happen, this simply shows that Captain Dunning was aware that Hacker had complained of stomach pain and opiate withdrawal, that the medical staff had been contacted, and that Hacker was being provided with medication for this condition.  The record does not show that Captain Dunning was aware that Hacker was facing a substantial risk of serious harm.  And there is no other information in the record indicating that Captain Dunning had any interaction with Hacker that would have alerted him to Hacker's serious medical needs. As a result, there is no basis to support a finding of deliberate indifference on the part of Captain Dunning.

### 7.  *Captain Jones*

Winkler's argument with regard to Captain Jones, like her argument relating to Deputy LaGrange, is that Captain Jones failed to provide Dr. Al-Shami with sufficient information about Hacker's medical condition.  We find no merit to this argument.  Captain Jones instructed Deputy LaGrange to call Dr. Al-Shami the first time that he learned of Hacker's medical complaints.  And when Hacker complained again several hours later, Captain Jones called Dr. Al-Shami himself and reported what he knew of Hacker's condition.  Captain Jones was entitled to rely on Dr. Al-Shami's conclusion that Hacker was not bleeding internally and that no change in treatment was needed.  *See Spears*, 589 F.3d at 255 (concluding that nonmedical jail personnel are entitled to reasonably rely on the assessments made by the medical staff).

Although Winkler argues that Captain Jones should have asked Dr. Al-Shami for a more detailed explanation of his order to monitor Hacker, this failure does not show that Captain Jones was deliberately indifferent to Hacker's serious medical needs.  Captain Jones said that general

instructions from medical staff to monitor an inmate meant that the inmate should "be placed back into [the] general population and the deputies, as they did their rounds[,] would just make sure that they looked at him, listened a little more closely for complaints no matter how small, things like that." As noted above, Captain Jones was entitled to rely on Dr. Al-Shami's opinion that such monitoring was sufficient. And although Captain Jones's shift ended soon after his call with Dr. Al-Shami, he passed along to Deputy Evans the instructions to monitor Hacker. These actions suggest that Captain Jones reasonably responded to, rather than disregarded, Hacker's apparent medical needs.

### 8.  *Captain Trickler*

Winkler also argues that Captain Trickler's conduct was constitutionally inadequate because he was aware of Hacker's distress when he passed out pills at Hacker's cell at 3:00 a.m. on Monday morning, May 5, but did not take any action to enter the cell or to assess Hacker's condition.

Although best practices would presumably require more, Captain Trickler's actions do not show that he perceived a substantial risk to Hacker's health and then ignored that risk. Winkler relies on *Shadrick v. Hopkins County*, 805 F.3d 724 (6th Cir. 2015), but that case is distinguishable in several material ways. In *Shadrick*, an inmate was known to have a staph infection as well as several other serious health conditions. A sergeant at the jail and an on-duty nurse were handing out medication when they arrived at the inmate's cell. The inmate said that he was unable to get up to receive his medication, so they went in to give it to him. They did not converse with the inmate or inquire into why he could not get up, nor did they attempt to assess his condition or notify other medical staff. In fact, no medical assessment or effort to contact a physician was made during the inmate's four-day detention, and no treatment was provided for his staph infection, which ultimately led to sepsis and caused his death on the fourth day.

The only issue on appeal in *Shadrick* was whether the corporate medical provider was liable under § 1983, so the court did not decide whether the sergeant and the nurse had exhibited deliberate indifference during the episode in question. But the court noted that the record as a whole showed that "[n]ot only were the . . . nurses aware of facts alerting them that [the inmate]

faced a substantial risk of serious harm if he did not receive timely and proper medical care, there is evidence they actually drew the inference of a substantial risk of serious harm and recklessly disregarded it." *Id.* at 744.

In contrast, when Captain Trickler arrived at Hacker's cell, he saw Hacker sitting on a table. Although Hacker appeared ill, there was no indication that Hacker was unable to move or that anything else about Hacker's appearance alerted Captain Trickler to the seriousness of his condition. Captain Trickler, unlike the sergeant and the nurse in *Shadrick*, did inquire into Hacker's condition by asking him what was wrong. Hacker said that he was experiencing withdrawal and "really going through it." According to Captain Trickler, Hackler's appearance was consistent with someone going through opiate withdrawal. Captain Trickler decided not to report the incident because Hacker did not request to see the medical staff, and the other inmates in Hacker's cell informed Captain Trickler that Hacker was already set to see the doctor later that same day.

Nothing in these facts supports a finding that Captain Trickler perceived that Hacker was facing a substantial risk of serious harm that required immediate medical attention. Instead, Captain Trickler addressed the risk that he did perceive by inquiring into Hacker's condition and confirming that Hacker would receive medical attention later in the day. Although Captain Trickler's failure to immediately report the incident or contact the medical staff arguably exhibited negligence, it does not suggest a conscious disregard of a substantial risk of serious harm to Hacker's health.

### 9. *Deputy Bratcher*

As the district court pointed out, whether Deputy Bratcher's conduct rose to the level of a constitutional violation is a "close call." But ultimately we agree with the court that the record would not support a jury finding that Deputy Bratcher perceived a substantial risk of serious harm to Hacker's health.

Deputy Bratcher, as discussed above, brought breakfast to Hacker at 5:30 a.m. on the day that Hacker died, but failed to take any steps for Hacker's care when Hacker did not get up to receive his meal. Although the better practice would have been for Deputy Bratcher to inquire

into why Hacker did not get up for breakfast—and her failure to do so might very well amount to negligence—her conduct does not reach the high standard of deliberate indifference because there is no evidence that Deputy Bratcher perceived a substantial risk of serious harm to Hacker's health.

Captain Trickler had informed Deputy Bratcher before breakfast about his earlier interaction with Hacker, explaining that Hacker was going through withdrawal, had filled out another sick-call-request form, and was receiving some type of medication. And, more importantly, Deputy Bratcher testified during her deposition that it was "not unusual" for inmates to not get up in the morning for breakfast.

As this court has explained, "an official's failure to alleviate a significant risk that he should have perceived but did not, while no cause for commendation, cannot under our cases be condemned as the infliction of punishment." *Farmer*, 511 U.S. at 838; *see also Speers v. County of Berrien*, 196 F. App'x 390, 396–97 (6th Cir. 2006) ("By itself, the fact that Hyun knew that Speers was going through alcohol withdrawal, an occasional reality of life in a prison setting, does not establish a triable issue of fact over deliberate indifference."). Deputy Bratcher's inaction, therefore, does not support a § 1983 claim against her.

### 10.  *Jailer Thomas*

Winkler further argues that Jailer Thomas is individually liable under § 1983 for violating Hacker's constitutional right to adequate medical care because, as the Madison County Jailer, Thomas was responsible for establishing policies and procedures for the Detention Center, for selecting the Detention Center's medical-services provider, and for training and supervising jail personnel and the medical staff. According to Winkler, the "[Detention Center] did not have adequate medical staffing, [and] did not have adequate policies in place or those policies were not followed."

This court has held that liability cannot be imposed on a supervisor under § 1983 based on the theory of respondeat superior. *Bellamy v. Bradley*, 729 F.2d 416, 421 (6th Cir. 1984) (citing *Hays v. Jefferson County*, 668 F.2d 869, 872–74 (6th Cir. 1982)). But a supervisor may be liable under § 1983 if he "abandon[s] the specific duties of his position . . . in the face of

actual knowledge of a breakdown in the proper workings of the department." *Taylor v. Mich. Dep't of Corr.*, 69 F.3d 76, 81 (6th Cir. 1995) (quoting *Hill v. Marshall*, 962 F.2d 1209, 1213 (6th Cir. 1992)).  This liability, however, exists only where some "execution of the supervisors' job function result[s] in [the p]laintiff's injury." *Gregory v. City of Louisville*, 444 F.3d 725, 752 (6th Cir. 2006).  In other words, the supervisor must have abdicated his specific job responsibility, with the "*active performance* of the [supervisor's] individual job function . . . directly result[ing] in the[] constitutional injury." *Id.* (emphasis in original).

In *Taylor*, for example, the warden had direct responsibility to review and approve all transfers of inmates from a prison and to "implement procedures that would protect vulnerable inmates from dangerous transfers."  69 F.3d at 80.  The evidence showed that the warden knew that the responsibility for approving transfers was being delegated by deputy wardens to lower-level staff, that he was not aware of the procedures used for approval of the transfers, and that he had no procedures in place for reviewing the transfers.  *Id.*  As a result, the court concluded that the evidence could support a finding that the warden's failure to review the transfers himself or to develop adequate transfer-review policies directly contributed to the plaintiff and other vulnerable inmates being transferred to facilities "where a substantial risk of serious harm existed."  *Id.* at 80–81; *see also Hill v. Marshall*, 962 F.2d 1209, 1213 (6th Cir. 1992) (holding a supervisor liable under § 1983 where he personally referred inmates' complaints of not getting their medication to a head nurse who he knew was altering or destroying inmates' prescriptions).  In the wake of *Taylor* and *Hill*, this court concluded that "'direct participation' or, at the very least, active acquiescence in the known misconduct are likely examples of the outer bounds of the 'active performance' necessary for a supervisory liability claim." *Essex v. County of Livingston*, 518 F. App'x 351, 355 (6th Cir. 2013).

Winkler does not contend that Jailer Thomas completely abdicated any of his responsibilities, but rather that he performed them inadequately.  To the extent that Winkler contends that Jailer Thomas exhibited deliberate indifference by failing to promulgate additional or alternative policies at the Detention Center, she has not cited any facts to show that Jailer Thomas allowed the jail to operate with the knowledge that existing healthcare policies were exposing inmates to a substantial risk of serious harm.

And with regard to Winkler's contention that Detention Center policies were not followed, she has not shown that Jailer Thomas had "actual knowledge of a breakdown in the proper workings of the [Detention Center]." *See Taylor*, 69 F.3d at 81. Winkler has cited no facts showing that Jailer Thomas was aware that jail personnel or the medical staff were not following Detention Center policies or that a pattern of constitutional violations existed at the Detention Center. There is thus no basis to conclude that Jailer Thomas acquiesced or directly participated in the provision of constitutionally inadequate care to Hacker.

### *11. The County*

Winkler next focuses on the County's alleged liability. The district court found that the County could not be held liable under § 1983 because "there is no underlying unconstitutional conduct by any of the individual defendants in this case." But Winkler contends that if the County's policy, custom, or failure to train directly caused a violation of Hacker's constitutional right to adequate medical care, then the County may still be held liable even if no individual defendant is found to have committed a constitutional violation.

This court in *Watkins v. City of Battle Creek*, 273 F.3d 682, 687 (6th Cir. 2001), stated that "[i]f no constitutional violation by the individual defendants is established, the municipal defendants cannot be held liable under § 1983." Having already upheld summary judgment in favor of all of the individual defendants with regard to a constitutional claim of deliberate indifference to serious medical needs, the court then upheld summary judgment in favor of the municipal defendants with regard to a claim that they had failed to properly train the individual defendants. *Id*.

Despite the fact that *Watkins* broadly states that the imposition of municipal liability is contingent on a finding of individual liability under § 1983, other cases from this circuit have indicated that the principle might have a narrower application. Judge Cole, in a concurring opinion in *Epps v. Lauderdale County*, 45 F. App'x 332 (6th Cir. 2002), explained:

> When no constitutional harm has been inflicted upon a victim, damages may not be awarded against a municipality. But a finding that the individual government actor has not committed a constitutional violation does not require a finding that no constitutional harm has been inflicted upon the victim, nor that the

> municipality is not responsible for that constitutional harm. . . .  A given constitutional violation may be attributable to a municipality's acts alone and not to those of its employees—as when a government actor in good faith follows a faulty municipal policy.  A municipality also may be liable even when the individual government actor is exonerated, including where municipal liability is based on the actions of individual government actors other than those who are named as parties.  Moreover, it is possible that no one individual government actor may violate a victim's constitutional rights, but that the combined acts or omissions of several employees acting under a governmental policy or custom may violate an individual's constitutional rights.

*Id.* at 334–35 (internal citations and quotation marks omitted).  *See also Garner v. Memphis Police Dep't*, 8 F.3d 358, 365 (6th Cir. 1993) (recognizing that "a municipality may not escape liability for a § 1983 violation merely because the officer who committed the violation is entitled to qualified immunity").

There is no indication that *Watkins* considered any of the situations discussed in *Epps* or *Garner* when it stated that municipal liability is contingent on a finding of individual liability. And the only case relied on by *Watkins* for that proposition, *City of Los Angeles v. Heller*, 475 U.S. 796 (1986) (per curiam), is not nearly so sweeping regarding the scope of *Monell* liability. *See id.* at 799 ("[N]either *Monell* . . . nor any other of our cases authorizes the award of damages against a municipal corporation based on the actions of one of its officers when in fact the jury has concluded that the officer inflicted no constitutional harm.  If a person has suffered no constitutional injury at the hands of the individual police officer, the fact that the departmental regulations might have *authorized* the use of constitutionally excessive force is quite beside the point." (emphasis in original)).

In fact, several other circuits have considered *Heller* and concluded that a municipality may be held liable under § 1983 in certain cases where no individual liability is shown.  *See e.g.*, *Fairley v. Luman*, 281 F.3d 913, 917 (9th Cir. 2002) ("If a plaintiff establishes he suffered a constitutional injury *by the City*, the fact that individual officers are exonerated is immaterial to [municipal] liability under § 1983." (emphasis in original)); *Speer v. City of Wynne*, 276 F.3d 980, 986 (8th Cir. 2002) ("The appropriate question under *Heller* is whether a verdict or decision exonerating the individual governmental actors can be harmonized with a concomitant verdict or decision imposing liability on the municipal entity.  The outcome of the inquiry depends on the

nature of the constitutional violation alleged, the theory of municipal liability asserted by the plaintiff, and the defenses set forth by the individual actors."); *Fagan v. City of Vineland*, 22 F.3d 1283, 1292, 1294 (3d Cir. 1994) (noting that "[i]f we conditioned municipal liability on an individual police officer's liability in every case, it might lead to illogical results," and holding that "a municipality can be liable under section 1983 and the Fourteenth Amendment for a failure to train its police officers with respect to high-speed automobile chases, even if no individual officer participating in the chase violated the Constitution").

But we need not decide whether, under our court's precedent, a municipality's liability under § 1983 is always contingent on a finding that an individual defendant is liable for having committed a constitutional violation. Even if we assume a negative answer to that question, Winkler has not presented facts from which a jury could find that the County had a policy or custom that caused a violation of Hacker's constitutional right to adequate medical care. *See Jones v. Muskegon County*, 625 F.3d 935, 946 (6th Cir. 2010) ("Liability may be imposed on a county only when a county 'policy' or 'custom' caused the plaintiff's injury and a 'direct causal link' existed between the policy and the purported denial of the right to adequate medical care.").

"To show the existence of a municipal policy or custom leading to the alleged violation, a plaintiff can identify: (1) the municipality's legislative enactments or official policies; (2) actions taken by officials with final decision-making authority; (3) a policy of inadequate training or supervision; or (4) a custom of tolerance or acquiescence of federal violations." *Baynes v. Cleland*, 799 F.3d 600, 621 (6th Cir. 2015). Winkler contends that the County should be held liable under § 1983 because it "had a policy of placing all medical care in the hands of [Healthcare] and its employees, even though [Healthcare] provided inadequate staffing and habitually failed [to] fulfill its contractual obligations, such as by failing to provide a medical policies and procedure handbook for the jail," and that this "'policy' or 'custom' led directly to the violation of Clint Hacker's constitutional rights."

But the record does not support Winkler's theory of liability based on the County's alleged policy. To the extent that she is arguing that the County's policy of contracting with a private medical provider for healthcare services at the Detention Center was facially unconstitutional, she provides no authority to support this contention. And this court has made

clear that it is not "unconstitutional for municipalities and their employees 'to rely on medical judgments made by [private] medical professionals responsible for prisoner care[,]'" *Graham ex rel. Estate of Graham v. County of Washtenaw*, 358 F.3d 377, 384 (6th Cir. 2004), a holding that necessarily leads us to conclude that a municipality may constitutionally contract with a private medical company to provide healthcare services to inmates. Winkler has therefore failed to identify any County policy that is facially unconstitutional.

"Where the identified policy is itself facially lawful, the plaintiff 'must demonstrate that the municipal action was taken with "deliberate indifference" as to its known or obvious consequences. A showing of simple or even heightened negligence will not suffice.'" *Gregory v. City of Louisville*, 444 F.3d 725, 752 (6th Cir. 2006) (quoting *Bd. of Cty. Comm'rs v. Brown*, 520 U.S. 397, 407 (1997)). Winkler offers no evidence that Healthcare's staffing or other policies presented an obvious risk to inmates' constitutional rights to adequate medical care. *See Free v. Granger*, 887 F.2d 1552, 1556 (11th Cir. 1989) ("It is not sufficient . . . to point to the absence of a medical doctor, or of a round-the-clock nurse, and decry the staffing policy as unconstitutional."). Nor does she offer any evidence that the County knew of and disregarded such a risk. And although Winkler contends that Healthcare failed to provide medical policies and procedures, she concedes that the County had its own healthcare policies and that Healthcare established various protocols for the provision of care to inmates like Hacker.

Even if we construe Winkler's argument to be that the County had a custom of "inaction" in the face of prolonged unconstitutional conduct by Healthcare, her argument would still fail. Winkler, to support such an argument,

> would have to allege (1) "a clear and persistent" pattern of unconstitutional conduct by [Healthcare] employees; (2) the municipality's "notice or constructive notice" of the unconstitutional conduct; (3) the municipality's "tacit approval of the unconstitutional conduct, such that [its] deliberate indifference in [its] failure to act can be said to amount to an official policy of inaction"; and (4) that the policy of inaction was the "moving force" of the constitutional deprivation . . . .

*See D'Ambrosio v. Marino*, 747 F.3d 378, 387–88 (6th Cir. 2014) (quoting *Doe v. Claiborne County*, 103 F.3d 495, 508 (6th Cir. 1996)). This she has failed to do. There is no record of Healthcare providing constitutionally inadequate medical care to inmates in the past, let alone

that the County was constructively aware of and thus tacitly approved such hypothetical unconstitutional conduct.

Winkler's next argument in support of imposing liability on the County appears to be that there was a custom or practice at the Detention Center of not following the County's own established policies for the provision of healthcare to inmates. To show that the County had such a custom or practice of inaction in the face of unlawful conduct by jail personnel and the medical staff, however, Winkler would have to present proof of a persistent pattern of unconstitutional conduct, and that the County had constructive notice of that pattern. *See D'Ambrosio*, 747 F.3d at 387–88. But Winkler discusses only Hacker's treatment, and therefore cannot establish that the County had a custom of deliberate indifference to the serious healthcare needs of all the inmates incarcerated at the Detention Center. *See Gregory*, 444 F.3d at 763 ("[A] plaintiff 'cannot rely solely on a single instance' to prove the existence of an unconstitutional custom." (quoting *Thomas v. City of Chattanooga*, 398 F.3d 426, 433 (6th Cir. 2005))).

Winkler further argues that the County is liable under § 1983 for its failure to adequately train its jail personnel. To succeed on a claim based on inadequate training, Winkler "must prove the following: (1) the training or supervision was inadequate for the tasks performed; (2) the inadequacy was the result of the municipality's deliberate indifference; and (3) the inadequacy was closely related to or actually caused the injury." *See Ellis ex rel. Pendergrass v. Cleveland Mun. Sch. Dist.*, 455 F.3d 690, 700 (6th Cir. 2006).

Even assuming that Winkler could show that the County's training of its jail personnel was inadequate, she presented no proof to show that this inadequacy resulted from deliberate indifference. This court in *Ellis* noted that there are

> two situations justifying a conclusion of deliberate indifference in claims of failure to train or supervise. "One is failure to provide adequate training in light of foreseeable consequences that could result from a lack of instruction." . . . "A second type of . . . deliberate indifference is where the city fails to act in response to repeated complaints of constitutional violations by its officers."

*Id.* at 700–01 (quoting *Brown v. Shaner*, 172 F.3d 927, 931 (6th Cir. 1999)). Because Winkler does not provide evidence of any previous instances where inmates have received

constitutionally inadequate healthcare at the Detention Center, the second situation is not in play here.

"The [first] mode of proof is available 'in a narrow range of circumstances' where a federal rights violation 'may be a highly predictable consequence of a failure to equip [employees] with specific tools to handle recurring situations." *Shadrick v. Hopkins County*, 805 F.3d 724, 739 (6th Cir. 2015) (quoting *Bd. of Cty. Comm'rs v. Brown*, 520 U.S. 397, 409 (1997)); *City of Canton v. Harris*, 489 U.S. 378, 390 (1989) (noting that a municipal defendant may be held liable if, "in light of the duties assigned to specific officers or employees[,] the need for more or different training is so obvious, and the inadequacy so likely to result in the violation of constitutional rights, that the policymakers . . . can reasonably be said to have been deliberately indifferent to the need").

Winkler's argument is that "[a]lthough jail policies and state regulations guarantee access to emergency medical care, there is no evidence that any jailer received training on anything other than basic first aid and CPR, even though the jailers were the only medical providers at the jail all but 40 hours per week." But Winkler does not identify what other medical training she believes that the jail personnel should have received. Nor does she explain how the quality of the medical training provided put the County on notice of the likelihood that jail personnel would respond inadequately to an inmate's medical emergency. In fact, as discussed above, Healthcare medical professionals were contacted multiple times with regard to Hacker's complaints of stomach pain. And Healthcare's medical staff was available to jail personnel, either in person or by phone, for consultation about an inmate 24 hours a day, 7 days a week. We therefore see no basis to conclude that the County exhibited deliberate indifference by failing to provide additional medical training to jail personnel. *See Harris*, 489 U.S. at 391 (explaining that it does not "suffice to prove that an injury or accident could have been avoided if an officer had had better or more training, sufficient to equip him to avoid the particular injury-causing conduct").

Winkler's final failure-to-train argument is that "the deputies in this case were not trained or instructed on how to monitor a patient when no medical personnel were available, and as a result did not adequately monitor Clint Hacker." But she does not cite to the record to support her proposition that jail personnel received no training on how to monitor inmates. Moreover,

she acknowledges that the usual practice at the Detention Center was for a physician to provide detailed guidance to jail personnel about how to monitor individual inmates if the physician determined that monitoring for a medical condition was necessary.  In sum, Winkler has failed to show that jail personnel's monitoring of Hacker was constitutionally inadequate in this case.  We therefore uphold the grant of summary judgment in favor of the County.

### 12. *Healthcare*

This leaves us with Winkler's claim against Healthcare itself.  A private entity, such as Healthcare, that contracts to provide medical services at a jail can be held liable under § 1983 because it is carrying out a traditional state function.  *See Johnson v. Karnes*, 398 F.3d 868, 877 (6th Cir. 2005).  "Like a municipality, a government contractor cannot be held liable on a *respondeat superior* theory," but rather "for a policy or custom *of that private contractor*."  *Id.* (emphasis in original).

Although Winkler contends that municipal liability should be imposed on Healthcare, she fails to clearly state her theory for liability.  Her principal argument appears to be that Healthcare failed to adequately train its medical staff.  But Winkler provides no supporting evidence or explanation other than a citation to a statement from her medical expert that the training was inadequate and an allegation that Nurse Johnson testified that she "did not know of, and was not required to follow, any policies and procedures."

The opinion of Winkler's medical expert that Healthcare's training program was inadequate is not, by itself, sufficient to show deliberate indifference because Winkler has neither provided evidence of past examples of constitutionally inadequate treatment of inmates by Healthcare's medical staff nor explained how the training program's alleged weaknesses were so obvious as to put Healthcare on notice that a constitutional violation was likely.  *See Ellis*, 455 F.3d at 700–01 (explaining the two ways that a plaintiff can show that inadequate training reflects deliberate indifference).

Moreover, Nurse Johnson did *not* testify that she was unaware of any policies or protocols for the treatment of inmates at the Detention Center.  She instead stated that she did not recall seeing any "policies and procedures manual" created by Healthcare itself.  Her

testimony indicates that she was in fact aware of and used the Detention Center's policies relating to the treatment of inmates. She simply noted that these policies were "guidelines" rather than mandatory rules, and that ultimately she was required to follow whatever orders she received from the physicians. And even if we could infer from Nurse Johnson's alleged failure to follow Healthcare's internal protocols when treating Hacker that she was inadequately trained, this alone cannot establish deliberate indifference on the part of Healthcare. *See Harris*, 489 U.S. at 390–91 ("That a particular officer may be unsatisfactorily trained will not alone suffice to fasten liability on the city, for the officer's shortcomings may have resulted from factors other than a faulty training program.").

And despite Winkler's argument to the contrary, the facts of this case are easily distinguishable from those of *Shadrick v. Hopkins County*, 805 F.3d 724 (6th Cir. 2015). The evidence in *Shadrick* revealed that the jail's private healthcare provider did not have a training program for its LPN nurses beyond very limited on-the-job training concerning issues like where supplies were kept. *Id.* at 740 (noting that the LPN nurses received no feedback, regular evaluations, or ongoing training about their medical responsibilities in the jail setting, and that two high-level supervisors disclaimed any responsibility for training and supervising the LPN nurses). According to *Shadrick*, there is an "obvious need to train LPN nurses who lack knowledge about the constitutional dimensions of providing adequate medical care to inmates in the jail setting." *Id.* at 742. The court therefore concluded that "[t]he lack of evidence that [the private healthcare provider] trained and supervised its nurses in their constitutional obligations to provide medical care could lead a reasonable jury to find that [the private healthcare provider] was deliberately indifferent to the inmates with whom the nurses came into contact." *Id.* at 744.

Here, there is evidence showing that Healthcare provided training to all of its medical staff concerning the civil rights of inmates, including the right to adequate medical care. This training included an initial one-on-one training session and ongoing group sessions several times a year, as well as specific training on how to provide healthcare to a subgroup of individuals with addictions. Because Winkler has not provided any contrary evidence or otherwise explained how Healthcare's training program was inadequate, the record would not

support a jury finding that Healthcare exhibited deliberate indifference toward inmates at the Detention Center by failing to adequately train its medical staff.  *See Miller v. Calhoun County*, 408 F.3d 803, 816 (6th Cir. 2005) ("Mere allegations that an officer was improperly trained or that an injury could have been avoided with better training are insufficient to prove liability.").

In her reply brief, Winkler raises the additional argument that Healthcare had inadequate policies and procedures.  She does not, however, identify a specific policy that reflects deliberate indifference to Hacker's right to adequate medical care.  And as noted above, to support an argument that Healthcare is liable for failing to create adequate policies, Winkler must identify repeated examples of Healthcare's medical staff providing constitutionally inadequate care to inmates.  *See D'Ambrosio v. Marino*, 747 F.3d 378, 387–88 (6th Cir. 2014) (quoting *Doe v. Claiborne County*, 103 F.3d 495, 508 (6th Cir. 1996)) (noting that, to support a deliberate-indifference claim against a municipal actor based on that actor's inaction, a plaintiff must show that the municipal actor had actual or constructive notice of a pattern of unconstitutional conduct).  She has failed to do so.  We therefore conclude that the record would not support a jury finding that Healthcare had a policy or practice of deliberate indifference to the serious medical needs of inmates like Hacker.

## C.    State-law claims

Winkler's remaining claims are brought under state law.  This court has held that "a federal court that has dismissed a plaintiff's federal-law claims should not ordinarily reach the plaintiff's state-law claims."  *Rouster v. County of Saginaw*, 749 F.3d 437, 454 (6th Cir. 2014) (quoting *Moon v. Harrison Piping Supply*, 465 F.3d 719, 728 (6th Cir. 2006)).  Because the district court did not err by granting summary judgment on Winkler's § 1983 constitutional claim, the court properly declined to exercise supplemental jurisdiction over Winkler's state-law claims.

### III.  CONCLUSION

There is no doubt that the facts of this case are tragic.  A young man lost his life while in the County's custody and, had his condition been diagnosed in time, he could have survived. Although Winkler identifies numerous facts suggesting that the defendants' actions fell below acceptable standards for medical care, she has not shown that these actions rose to the level of a constitutional violation.  In the end, the facts support a case of misdiagnosis rather than one of deliberate indifference.  Winkler, however, is not left without a remedy.  She can pursue her negligence and other state-law claims in state court.

For all of the reasons set forth above, we **AFFIRM** the judgment of the district court.